In the Circuit Court for Baltimore County
Case No. K-04-CR-001787

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1081

September Term, 2016

_____

MATTHEW TIMOTHY MCCULLOUGH

v.

STATE OF MARYLAND

_____

Eyler, Deborah S.,
Berger,
Sharer, J. Frederick (Senior Judge,
                 Specially Assigned),

JJ.

_____

Opinion by Eyler, Deborah S., J.

_____

Filed:  August 30, 2017

Graeff, Kathryn Grill, J., did not participate in the Court's decision to report this opinion pursuant to Md. Rule 8-605.1.

This case presents the question whether four consecutive 25-year sentences imposed against a juvenile for nonhomicide crimes constitute cruel and unusual punishment, categorically. More specifically, it causes us to consider whether the United States Supreme Court's holding in *Graham v. Florida*, 560 U.S. 48 (2010), that it is a categorical violation of the Eighth Amendment for a juvenile nonhomicide offender to be sentenced to life without parole ("LWOP"), extends to these multiple-victim, multiple-crime term-of-years sentences. We hold that *Graham* does not extend to the sentences in this case and they are not otherwise cruel and unusual.

**FACTS AND PROCEEDINGS**

On Tuesday, May 4, 2004, Matthew Timothy McCullough, the appellant, and Martise Williams, both students at Randallstown High School, in Baltimore County, got into an argument when Williams called the appellant a "bitch." Over the next several days, the controversy escalated. Efforts by school officials to "calm the waters" by meeting with the students and their parents proved fruitless. School officials told appellant not to be on school grounds on Friday, May 7, 2004. He came to the school that day anyway and during the course of a school basketball game let it be known that he and three companions were looking for a fight. School officials ordered them off the grounds.

Later that afternoon, when the basketball game was letting out, the appellant returned with his three companions. The appellant was 17½ years old, but his companions were older and were not students. The four walked together "towards the school where a group of kids were hanging out on the sidewalk." *McCullough v. State*,

No. 2812, Sept. Term. 2004, slip op. at 2 (filed Nov. 28, 2005). According to a teacher who witnessed what happened next, the four approached a group of students, "[a] few words were exchanged, a punch was thrown, and there was a fight." A crowd of 30 or 40 students formed. When it became clear that the four were not going to prevail, one of them, Tyrone "Fat Boy" Brown, retrieved a handgun from his car. "Fat Boy" and the appellant shared the handgun, using it to fire a total of 12 shots into the crowd. Four students were seriously wounded; one of them was shot in the back of the neck and is paralyzed from the chest down.

On November 23, 2004, a jury in the Circuit Court for Baltimore County convicted the appellant of four counts of first degree assault, one for each victim. Sentencing took place on January 27, 2005. Exercising his right to allocution, the appellant made the following statement:

> Your Honor, I would like to say what happened on May 7th was a tragedy. I'd like to apologize for what happened that day and I'd like to apologize for putting the victims and their families through the pain and suffering. And I know that a punishment is acceptable, and I'm here to accept the punishment. Thank you.

When asked by his lawyer whether he thought that, "[a]t some point in [his] life," he could "rejoin [the] community and be a productive part of society[,]" the appellant responded, "Yes."

The court sentenced the appellant to the maximum 25 years for each conviction, to be served consecutively, for an aggregate sentence of 100 years. In doing so, the judge characterized the crimes as "vicious and heinous," described the "horror" endured by the

-2-

families of the students and the fear the crimes created in the community, and recounted the seriousness of the victims' injuries. He characterized the appellant as a "suburban terrorist" and a "coward" and observed that until sentencing he had shown no remorse and had bragged about "beat[ing] the attempted murder wrap [sic]" and the use of a handgun charge.

Eleven years later, on March 25, 2016, the appellant filed a motion to correct illegal sentence, arguing that his aggregate sentence of 100 years violated the prohibition against cruel and unusual punishment in the Eighth Amendment to the United States Constitution and in Article 25 of the Maryland Declaration of Rights. The circuit court denied the motion without a hearing, by order entered on June 27, 2016.

The appellant noted a timely appeal, asking:

Does a juvenile nonhomicide offender's prison sentence of 100 years violate the Eighth Amendment to the United States Constitution and/or Article 25 of the Maryland Declaration of Rights?

For the reasons set forth below, we shall affirm the order of the circuit court.

**DISCUSSION**

**A.**

The Eighth Amendment to the federal constitution, applicable to the States through the Fourteenth Amendment, *see Robinson v. California*, 370 U.S. 660 (1962), provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor

cruel and unusual punishments inflicted."[1]  Early Supreme Court jurisprudence interpreting the Cruel and Unusual Punishments Clause prohibited barbaric punishments, such as torture or methods of execution causing undue suffering.  *See, e.g., Wilkerson v. Utah*, 99 U.S. 130, 135-36 (1878) (noting in *dicta* that the punishment of torture is prohibited); *In re Kemmler*, 136 U.S. 436, 447 (1890) ("Punishments are cruel when they involve torture or a lingering death . . . .").

In *Weems v. United States,* 217 U.S. 349, 367 (1910), the Supreme Court recognized in the Cruel and Unusual Punishments Clause the "precept . . . that punishment for crime should be graduated and proportioned to [the] offense."  *See also Coker v. Georgia*, 433 U.S. 584, 592 (1977) (Eighth Amendment "bars not only those punishments that are 'barbaric' but also those that are 'excessive' in relation to the crime committed.").  The sentence at issue in *Weems* was "*cadena temporal*," a punishment permitted by the law of the Philippines for the crime of making a false entry in a public record.  *Cadena temporal* consists of "imprisonment for at least 12 years and one day, in chains, at hard and painful labor; the loss of many basic civil rights; and subjection to lifetime surveillance."  *Gregg v. Georgia*, 428 U.S. 153, 171 (1976).  The Court held that that punishment violated the Cruel and Unusual Punishments Clause not because it was barbaric, but because it was excessive and disproportionate to the crime for which it was imposed.

---

[1] Article 25 of the Maryland Declaration of Rights states: "That excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted, by the Courts of Law."

After *Weems*, two types of proportionality analyses emerged. In one type, the Court imposed "categorical restrictions on the death penalty." *Graham*, 560 U.S. at 59. In some of those cases, the Court categorically prohibited the death penalty because it was unconstitutionally excessive in relation to the severity of a particular offense. *See Kennedy v. Louisiana*, 554 U.S. 407 (2008) (rape of a child); *Coker*, 433 U.S. at 584 (rape of an adult); *Enmund v. Florida*, 458 U.S. 782 (1982) (non-triggerman felony murderer). In others, the Court categorically prohibited the death penalty because it was unconstitutionally excessive in relation to the diminished culpability of a particular class of offenders. *See Atkins v. Virginia*, 536 U.S. 304, 306 (2002) ("mentally retarded" offenders); *Roper v. Simmons*, 543 U.S. 551 (2005) (juvenile offenders). In determining whether to impose a categorical proportionality restriction, the Court has looked to state legislative enactments and practices to assess whether a national consensus has emerged for or against a particular punishment vis-à-vis a class of offenders, *see, e.g., Atkins*, 536 U.S. at 313–15; and whether the penological goals of retribution and deterrence are served by imposing the punishment. *See, e.g., Roper*, 543 U.S. at 571.

In the other type of proportionality analysis, the Supreme Court reviews "the length of term-of-years sentences given all the circumstances in a particular case . . . . to determine whether the sentence is unconstitutionally excessive." *Graham*, 560 U.S. at 59. Three "'objective criteria'" are relevant to this analysis: "the gravity of the offense as compared to the harshness of the penalty; the sentences imposed on others in the same jurisdiction; and the sentences imposed for the same offense in other jurisdictions."

*United States v. Young*, 766 F.3d 621, 626 (6th Cir. 2014) (quoting *Solem v. Helm,* 463 U.S. 277, 288, 292 (1983)). Ordinarily, a court will reach the latter two criteria only if its consideration of the first factor gives rise to "an initial inference of gross disproportionality." *Id*. In these proportionality review cases, the Supreme Court almost always has upheld the sentences. *See Rummel v. Estelle*, 445 U.S. 263, 273 (1980) ("Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.") For example, in *Harmelin v. Michigan*, 501 U.S. 957 (1991), a plurality of the Court upheld a mandatory LWOP sentence for the crime of possession of 672 grams of cocaine, stating that the Eighth Amendment's "proportionality principle" is "narrow" and "does not require strict proportionality between crime and sentence." *Id.* at 997, 1001. "[I]t forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id*. at 1001.[2]

The Court's 2010 decision in *Graham*, 560 U.S. at 82, altered the landscape of proportionality review by imposing, for the first time, a categorical sentencing restriction outside the realm of the death penalty. The defendant in *Graham* was convicted of armed

---

[2] *See also Ewing v. California*, 538 U.S. 11 (2003) (upholding a sentence of 25 years to life for the theft of golf clubs under California's three strikes sentencing scheme); *Rummel*, 445 U.S. at 263 (upholding a sentence of life with the possibility of parole for a defendant's third nonviolent felony, the crime of obtaining money by false pretenses); *Hutto v. Davis*, 454 U.S. 370 (1982) (*per curiam*) (upholding a sentence of 40 years for possession of marijuana with intent to distribute and distribution of marijuana). *But see Solem*, 463 U.S. at 288 (striking down a sentence of life without the possibility of parole under a recidivist sentencing scheme against an adult offender who was convicted, as his third offense, of uttering a "no account" check for $100).

burglary and another offense, both committed when he was 16. In a plea agreement, he was sentenced to probation before judgment. He committed additional crimes, in violation of his probation. The court found him guilty of the armed robbery and sentenced him to LWOP.[3] The Supreme Court held that sentencing juvenile offenders to LWOP for a nonhomicide crime is cruel and unusual punishment.

The *Graham* Court began its analysis by considering "objective indicia of national consensus" about LWOP sentences imposed against juvenile nonhomicide offenders. *Id.* at 62. It commented that (at that time) thirteen states prohibited LWOP sentences for juvenile nonhomicide offenders.[4] Thirty-seven states, and the federal courts, permitted LWOP for juvenile nonhomicide offenders, but the sentence very rarely was imposed.

Relying on a 2009 study and its own independent research, the Court determined that across the nation only 123 juvenile offenders were serving LWOP sentences for nonhomicide offenses. *See* P. Annino, D. Rasmussen, & C. Rice, *Juvenile Life without Parole for Non-Homicide Offenses: Florida Compared to Nation*, 14 (Sept. 14, 2009) ("*Juvenile LWOP Study*"). Florida accounted for 77 of those offenders and another 10 states accounted for the remaining 46. Thus, while 38 jurisdictions permitted juvenile nonhomicide offenders to be sentenced to LWOP, only 11 jurisdictions had imposed that sentence and, with the exception of Florida, they did so "quite rarely." *Id.* at 64.

---

[3] Graham actually was sentenced to life in prison but before then Florida had abolished its parole system, so the sentencing judge knew that the life sentence was without an opportunity for parole.

[4] Six of those states prohibited LWOP sentences for *any* juvenile offenders.

Although the practice of imposing LWOP sentences against juvenile nonhomicide offenders was not as rare as the practices had been in the death penalty cases where the Court had adopted categorical bars, *see, e.g.*, *Atkins*, 536 U.S. at 316 (5 executions of "mentally retarded" defendants over 13 years), it was "exceedingly rare" when measured against the number of juveniles convicted of nonhomicide crimes each year. *Graham,* 560 U.S. at 67. In the Court's view, it was "'fair to say that a national consensus [had] developed against it.'" *Id*. (quoting *Atkins*, 536 U.S. at 316).

The Court then considered whether in this context LWOP sentences are justified by the "culpability of the offenders." *Id*. In doing so, it followed the same rationale undergirding its decision in *Roper* to categorically prohibit the death penalty for juvenile offenders. In *Roper,* the defendant was convicted of murder, burglary, and kidnapping, committed when he was 17, and was sentenced to death. Reasoning that the death penalty, being the worst punishment, should be reserved for the worst offenders, the Supreme Court identified "[t]hree general differences between juveniles under 18 and adults [which] demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders[.]" *Id.* at 569. They suffer from "'[a] lack of maturity and an underdeveloped sense of responsibility'" that "'often result in impetuous and ill-considered actions and decisions.'" *Id.* (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)). They "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id.* And their characters are "not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." *Id.* at

570.  Due to these differences, juveniles have "diminished culpability" and once that "is recognized, it is evident that the penological justifications for the death penalty apply to them with lesser force than to adults." *Id.* at 571.  The *Roper* Court rejected the argument that a categorical bar was unnecessary because the criminal justice system already provides case-by-case consideration of mitigating factors, including the age of the offender.  It found that the "differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability." *Id.* at 572–73.

Finally, the Court in *Graham* examined the "penological justifications for the sentencing practice" of LWOP, *i.e.,* retribution, deterrence, incapacitation, and rehabilitation, and found that none of them supported LWOP sentences for juvenile nonhomicide offenders. *Id.* at 71–74.  The "'heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender.'" *Id.* at 71 (quoting *Tison v. Arizona,* 481 U.S. 137, 149 (1987)).  Once again relying on *Roper,* the Court reasoned that "'the case for retribution is not as strong with a minor as with an adult,'" and "becomes even weaker with respect to a juvenile who did not commit homicide." *Id.* (quoting *Roper,* 543 U.S. at 571).  Juveniles "'will be less susceptible to deterrence[,]'" *id.* (quoting *Roper,* 543 U.S. at 571), because they lack maturity and have an "'underdeveloped sense of responsibility[.]'" *Id.* at 72 (quoting *Johnson,* 509 U.S. at 367).  LWOP sentences have little deterrent effect because they are imposed so rarely. *Id*.  Incapacitation is not an adequate justification because one cannot

reasonably assume that a juvenile nonhomicide offender "forever will be a danger to society[.]" *Id.* at 72. And the LWOP penalty runs contrary to the goal of rehabilitation because it is based on an "irrevocable judgment" that a juvenile nonhomicide offender lacks capacity for change and is equally culpable as an adult offender. *Id.* at 74.

The *Graham* Court concluded that the national consensus against LWOP sentences for juveniles, the diminished culpability of juveniles, and the absence of penological justifications together warranted a departure from the ordinary "case-by-case proportionality approach," *id.* at 77, for the imposition of "'the second most severe penalty permitted by law'" against a juvenile for a nonhomicide crime. *Id.* at 69 (quoting *Harmelin*, 501 U.S. at 1001). It emphasized that a LWOP sentence "alters the offender's life by a forfeiture that is irrevocable[,]" and "deprives the convict of the most basic liberties without giving hope of restoration[.]" *Id.* at 69–70. "[T]his sentence 'means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days." *Id.* at 70–71 (quoting *Naovarath v. State*, 779 P.2d 944, 944 (Nev. 1989)) (second alteration in *Graham*). For the same reasons the Court explained in *Roper*, juveniles cannot "'reliab[ly] be classified among the worst offenders[,]'" and therefore are undeserving, across the board, of such a harsh sentence. *Id.* at 68 (quoting *Roper*, 543 U.S. at 569). Indeed, LWOP "is an especially harsh punishment for a juvenile" because "a juvenile offender will on average

serve more years and a greater percentage of his life in prison than an adult offender." *Id.* at 70.

The Court concluded:

> In sum, penological theory is not adequate to justify life without parole for juvenile nonhomicide offenders. This determination; the limited culpability of juvenile nonhomicide offenders; and the severity of life without parole sentences all lead to the conclusion that the sentencing practice under consideration is cruel and unusual. *This Court now holds that for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole.*

*Id.* at 74 (emphasis added). Further refining its holding, the Court went on to explain:

> A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that *while the Eighth Amendment prohibits a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life*. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does prohibit States from making the judgment *at the outset* that those offenders never will be fit to reenter society.

*Id.* at 75 (emphasis added).

Two years later, in *Miller v. Alabama*, 567 U.S. 460 (2012), the Supreme Court held that *mandatory* LWOP sentences for juvenile *homicide* offenders violate the Eighth Amendment, categorically. The Court reasoned that mandatory LWOP penalty schemes "prevent the sentencer from taking account of" the diminished culpability of juveniles:

"By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—these laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." *Id.* at 474. In addition, mandatory LWOP sentences prevent the sentencer from taking the "'mitigating qualities of youth'" into account. *Id.* at 476 (quoting *Johnson*, 509 U.S. at 367). The Court concluded that

> a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles. By requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory-sentencing schemes before us violate this principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment.

*Id.* at 489.[5,6]

---

[5] In *Montgomery v. Louisiana*, ___ U.S. ___, 136 S.Ct. 718, 736 (2016), the Supreme Court held that *Miller* "announced a substantive rule of constitutional law," and therefore applies retroactively. It noted, however, that resentencing was not necessary, and "[a] State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole." *Id.* Addressing the specifics of the defendant's case, the Court stated:

> Henry Montgomery has spent each day of the past 46 years knowing he was condemned to die in prison. Perhaps it can be established that, due to exceptional circumstances, this fate was a just and proportionate punishment for the crime he committed as a 17-year-old boy. In light of what this Court has said in *Roper*, *Graham*, and *Miller* about how children are constitutionally different from adults in their level of culpability, however, prisoners like Montgomery must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored.

*Id.* at 736–37.

**B.**

In the case at bar, the appellant contends his 100-year sentence, comprising four consecutive 25-year sentences, is the functional equivalent of a LWOP sentence for nonhomicide crimes, and therefore violates the Eighth Amendment under *Graham*. Because he will not be eligible for parole until he has served 50% of each consecutive sentence, the earliest he may be released is 2054, when he will be 67 years old. *See* Md. Code (1999, 2008 Repl. Vol.), § 7-301(c)(1)(i) of the Correctional Services Article ("CS").[7] He argues that by imposing a sentence with a 50-year non-parole period, the

---

(…continued)

[6] Very recently, during the pendency of the instant appeal, the Supreme Court, in a *per curiam* decision, reversed a divided panel of the Fourth Circuit that had held in *LeBlanc v. Mathena*, 841 F.3d 256 (4th Cir. 2016), that a state court adjudication affirming a sentence of LWOP imposed against a juvenile offender for a nonhomicide offense (rape) was an "'unreasonable application of clearly established Federal law.'" *Virginia v. LeBlanc*, __ U.S. __, 137 S.Ct. 1726, 1727 (2017) (quoting 28 U.S.C. § 2254(d)(1)). The Supreme Court of Virginia had held that the sentence did not violate the Eighth Amendment because even though the sentence was without parole the defendant would be eligible for the state's geriatric release program, at age 60, and therefore would have a "meaningful opportunity" for release. On federal habeas review, a federal district court reversed and the Fourth Circuit affirmed that decision, holding that the geriatric release program did not "provide a meaningful opportunity for juvenile nonhomicide offenders to obtain release based on demonstrated maturity and rehabilitation." *Id*. at 1728.

The Supreme Court granted *certiorari* and summarily reversed, emphasizing that *Graham* did "not decide that a geriatric release program like Virginia's failed to satisfy the Eighth Amendment because that question was not presented." *Id* at 1728-29. Expressing "no view on the merits," it held that the Fourth Circuit had not accorded sufficient deference to the state court adjudication under the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *Id*. at 1729 (citation omitted).

[7] CS section 7-301(c)(1)(i) provides that

(Continued…)

-13-

court denied him a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" while he is of an age to have the chance for reconciliation with society and fulfillment outside prison, contrary to the Cruel and Unusual Punishments Clause. *See Graham*, 560 U.S. at 75.[8]   He maintains further that even if the length of the non-parole portion of his sentence does not violate the Eighth Amendment, once he becomes parole eligible, the Maryland parole system will not afford him a "meaningful opportunity" for release.  He asks this Court to vacate all four sentences for first degree assault and remand the case to the circuit court for resentencing "in accordance with *Graham* and its progeny."

The State counters that the appellant was not sentenced to LWOP; rather, he was given four consecutive term-of-years sentences, all within the maximum allowed by law and each for a crime against a different victim.  It points out that the Supreme Court has never held a term-of-years sentence categorically unconstitutional and maintains there are

---

(…continued)
> an inmate who has been sentenced to the Division of Correction after being convicted of a violent crime committed on or after October 1, 1994, is not eligible for parole until the inmate has served the greater of:
>
> 1.  one-half of the inmate's aggregate sentence for violent crimes; or
> 2.   one-fourth of the inmate's total aggregate sentence.

In the case at bar, all four sentences imposed were for violent crimes and the appellant must serve one-half of his aggregate sentence, or 50 years.

[8] He argues that for the same reason his sentence violates Article 25 of the Maryland Declaration of Rights.

no "principled bases for substituting the statutory maximum set by the legislature with an ad hoc statutory maximum as defined by an appellate court." Furthermore, the State argues, the appellant may not challenge the constitutionality of the Maryland parole statutes in a motion to correct an illegal sentence and, in any event, the parole statutes require the Parole Commission to consider "demonstrated maturity and rehabilitation" in assessing whether to grant parole to a juvenile nonhomicide offender.

## C.

In the seven years since the Supreme Court decided *Graham*, courts across the country have grappled with what impact, if any, it has on term-of-years sentences for juveniles sentenced for nonhomicide crimes, with varying results. *See Moore v. Biter*, 742 F.3d 917, 920 (9th Cir. 2014) (*dissent from denial of rehearing en banc*) (discussing the split in authority and collecting cases). We shall discuss some of these cases below.

1. ***Graham* does not apply to consecutive term-of-years sentences imposed for multiple offenses**

Appellate courts in five states—Arizona, Louisiana, Virginia, Colorado, and Missouri—have held that *Graham*'s categorical prohibition does not apply to multiple term-of-years sentences for multiple offenses that, cumulatively, exceed a juvenile offender's natural life expectancy. *See State v. Kasic*, 265 P.3d 410 (Ariz. Ct. App. 2011); *State v. Brown*, 118 So.3d 332 (La. 2013); *Vasquez v. Commonwealth of Virginia*, 781 S.E.2d 920 (Va. 2016), *cert. denied __* U.S. __, 137 S.Ct. 568 (2016); *Lucero v. People*, 394 P.3d 1128 (Co. 2017); *People v. Rainer*, 394 P.3d 1141 (Co. 2017); *Willbanks v. Dep't of Corrections*, __ S.W.3d __, 2017 WL 2952445 (Mo. 2017), *pet. for*

*cert. filed*, No. 17-165 (Jul. 28, 2017). Some of these courts have held that *Graham never* applies outside of LWOP sentences. Others have held that even if *Graham* might apply to one term-of-years sentence for a single offense that is so lengthy as to be a *de facto* LWOP sentence, it cannot apply to a lengthy aggregate sentence resulting from a multitude of offenses committed by the juvenile offender.

### **Arizona (2011):** *State v. Kasic*, 265 P.3d 410

The defendant was convicted of "thirty-two felonies arising from six arsons and one attempted arson committed over a one-year period beginning when he was seventeen years of age." 265 P.3d at 411. He received an aggregate sentence of 139.75 years.[9] On appeal, he argued that "the 'reasons underlying the Court's decision in *Graham* [were] applicable to juveniles, such as [him], serving a term-of-years sentence exceeding the juvenile's life expectancy.'" *Id*. at 414 (second alteration in original).

The Arizona Court of Appeals disagreed, stating that the opinion in *Graham* "made clear" that the case only applied to juvenile offenders sentenced to life without parole; therefore, "*Graham* does not categorically bar the sentences imposed in this case." *Id*. at 415. The court "decline[d] to extend [*Graham's*] reasoning in the manner [the defendant] urge[d]." *Id*. It proceeded with a conventional proportionality review, "considering all of the circumstances of [the defendant's] case[,]" including the "gravity of the offenses and the severity of the combined sentence," and concluded that the

---

[9] Several of the offenses were committed when he was a juvenile; some were committed after he turned 18. Of the aggregate sentence of 139.75 years, 80.5 were for arsons he committed when he was a juvenile. 265 P.3d at 411 n.1.

"sentences [were] not 'constitutionally excessive.'" *Id.* Noting that the defendant did not receive any single sentence longer than 15.75 years, and relying upon the "general rule" that the court will "not consider the imposition of consecutive sentences in the proportionality inquiry,"[10] the court found that "different considerations apply to consecutive term-of-years sentences based on multiple counts and multiple victims." *Id.* at 415–16. The "sentences, viewed individually and in the aggregate, further Arizona's penological goals and thus reflect a rational legislative judgment, entitled to deference." *Id.* at 416 (citation and quotation marks omitted).[11]

**Louisiana (2013):** *State v. Brown*, 118 So.3d at 332

The defendant was convicted of one count of aggravated kidnapping, for which he was sentenced to life, and four counts of armed robbery, for which he was sentenced to four concurrent terms of 10 years. He was 16 when he committed the offenses. The court originally had imposed concurrent sentences, without parole, but amended the sentences post-*Graham*. The State took issue with the amendments to the term-of-years sentences. The case came before the Supreme Court of Louisiana on the question "whether, and to what extent, the . . . decision in *Graham* applies in cases in which the juvenile offender committed multiple offenses resulting in cumulative sentences matching or exceeding his life expectancy without the opportunity of securing early

---

[10] We shall discuss this principle *infra*.

[11] The opinion in *Kasic* does not provide any information about whether, and if so when, the defendant would become eligible for parole.

release from confinement on parole." 118 So.3d at 335. Observing that *Graham* did not include any "analysis of sentences for multiple convictions and provide[d] no guidance on how to handle such sentences," the court concluded that *Graham* does "not prohibit consecutive term of year sentences for multiple offenses committed [by a juvenile], even if they might exceed a defendant's lifetime." *Id*. at 341. (As we shall discuss, *infra*, the same court later reached a different result in addressing a lengthy term-of-years sentence against a juvenile for *one* offense.)

**Virginia (2016):** *Vasquez v. Commonwealth of Virginia*, 781 S.E.2d 920

When they were 16 years old, the defendants broke into a townhouse, stole property, and repeatedly raped and sexually assaulted the female occupant at knifepoint. In a joint jury trial, Vasquez was convicted of eighteen felonies and Valentin was convicted of twelve felonies. These crimes included forcible vaginal and anal rape, breaking and entering while armed with a deadly weapon, forcible fellatio, abduction, and robbery. The court sentenced each defendant to multiple term-of-years sentences "which, in the aggregate, equaled 283 years for Vasquez, with 150 years suspended, and 148 years for Valentin, with 80 years suspended." 781 S.E.2d at 926. As a result, Vasquez would serve 133 years of active incarceration and Valentin would serve 68 years. Pursuant to Virginia law, both would become eligible for parole upon reaching the age of 60. *Id.* at 924 n.3.

In a consolidated appeal, the Supreme Court of Virginia held that *Graham* is not implicated for "multiple term-of-years sentences imposed on multiple crimes that, by

virtue of the accumulation, exceed the criminal defendant's life expectancy." 291 Va. at 925. The multiple sentences imposed by the trial court were "nothing like *Graham*, which involved a single crime resulting in a single [LWOP] sentence." *Id*. at 926.

In reaching this result, the *Vasquez* court was persuaded by the reasoning of the Sixth Circuit Court of Appeals in *Bunch v. Smith*, 685 F.3d 546 (6th Cir. 2012), *cert. denied sub nom. Bunch v. Bobby*, __ U.S. __, 133 S.Ct. 1996 (2013). The defendant in *Bunch* was convicted of robbing, kidnapping, and repeatedly raping a young woman when he was 16 and was sentenced by an Ohio state court to "consecutive, fixed terms totaling 89 years' imprisonment." *Id*. at 547. After *Graham* was decided, he petitioned, unsuccessfully, for habeas relief in state court. He challenged that ruling in federal court. The Sixth Circuit held that the sentence did not "violate clearly established federal law" and, therefore, the habeas petition properly had been denied.[12] It distinguished *Graham*, noting that Graham "was sentenced to life in prison for committing one nonhomicide offense, [whereas] Bunch was sentenced to consecutive, fixed-term sentences—the longest of which was 10 years—for committing multiple nonhomicide offenses." *Id*. at 551. The Sixth Circuit recognized that "Bunch's 89-year aggregate sentence may end up being the functional equivalent of life without parole," making it likely that he would

---

[12] Federal habeas review is highly circumscribed. Under the AEDPA, a federal court may reverse a state court adjudication as contrary to clearly established federal law only if the defendant can show that the "ruling [was] 'objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Virginia v. LeBlanc*, 137 S.Ct. at 1729 (quoting *Woods v. Donald*, 575 U.S. ___, ___, 135 S.Ct. 1372, 1376 (2015) (*per curiam*)).

-19-

"not be given the 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' called for in *Graham*." *Id*. Emphasizing that the *Graham* "Court did not address juvenile offenders, like Bunch, who received consecutive, fixed-term sentences for committing multiple nonhomicide offenses," *id*., the court concluded that the *Graham* holding is limited to cases in which LWOP has been imposed for a single nonhomicide offense.

**Colorado (2017):** *Lucero v. People*, 394 P.3d 1128 & *People v. Rainer*, 394 P.3d 1141

In two cases decided the same day, the Supreme Court of Colorado held that *Graham* does not apply to aggregate sentences of 84 years and 112 years, respectively, imposed upon juvenile offenders for nonhomicide crimes. *Lucero*, 394 P.3d at 1128; *Rainer*, 394 P.3d at 1141. Lucero was convicted of conspiracy to commit first degree murder, attempted first degree murder, and two counts of second degree assault. He committed these crimes in the course of a drive-by shooting when he was 15. He was sentenced "to consecutive term-of-years prison sentences for each count, aggravated as crimes of violence, resulting in an aggregate sentence of eighty-four years[.]" 394 P.3d. at 1129. He would become parole eligible at age 57. Rainer was 17 years old when he broke into an occupied dwelling and "shot one of the home's inhabitants four times and another inhabitant three times, leaving both in critical condition." 394 P.3d at 1143. He was convicted of "two counts of attempted first-degree murder, two counts of first-degree assault, one count of first-degree burglary, one count of aggravated robbery, and

sentence-enhancement counts for crimes of violence." *Id*. Sentenced to an aggregate term of 112 years, he would become parole eligible at age 75.[13]

After *Graham* was decided, the defendants sought post-conviction relief, arguing that their sentences were "the functional equivalent of a sentence of life without parole and denie[d] [them] a meaningful opportunity for release." *Id*. Both cases reached the Supreme Court of Colorado, which held that *Graham* (and *Miller*) only apply "where a juvenile is sentenced to the specific sentence of life without the possibility of parole *for one offense*." 394 P.3d at 1132 (emphasis added.) "Multiple sentences imposed for multiple offenses do not become a sentence of life without parole, even though they may result in a lengthy term of incarceration." *Id.* at 1133. Because "each sentence is a separate punishment for a separate offense," the "proper question on review is whether a sentence is constitutionally disproportionate to the offense for which it was imposed." *Id*. (citing *Close v. People*, 48 P.3d 528 (Colo. 2002)). Otherwise, a defendant could "'generate an Eighth Amendment disproportionality claim simply because [he] had engaged in repeated criminal activity.'" *Id*. (quoting *Close*, 48 P.3d at 539). Applying those principles, the court held that the defendants' sentences were not unconstitutionally disproportionate relative to each offense.[14]

---

[13] Rainer initially was sentenced to an aggregate term of 224 years, but his sentence was reduced on direct appeal.

[14] A division of the Colorado intermediate appellate court also addressed a *Graham* challenge to multiple term-of-years sentences in *People v. Lehmkuhl*, 369 P.3d 635 (Colo. App. 2013). In that case, the defendant was serving an aggregate sentence of

(Continued…)

**Missouri (2017):** *Willbanks v. Department of Corrections*, ___ SW.3d ___, 2017 WL 2952445

At age 17, the defendant and two accomplices participated in an armed carjacking, shooting the victim four times. The defendant was convicted of first degree assault, kidnapping, two counts of first degree robbery, and three counts of armed criminal action. The court sentenced him to consecutive terms of life for assault; 15 years for kidnapping; 20 years for each robbery count; and 100 years for each armed criminal action count. State statutes required him to serve 85% of his sentences before he could become parole eligible, meaning that he could not be paroled until he was "approximately 85 years old." *Id*. at *2. After *Graham* was decided, the defendant filed a declaratory judgment action seeking a ruling that these statutes were "unconstitutional as applied to him." *Id*.

On July 11, 2017, the Supreme Court of Missouri, by a majority of judges, held that *Graham* does not govern cases in which juvenile offenders were "convicted of multiple nonhomicide offenses and received multiple fixed-term sentences." *Id*. at *1. In its view, the *Graham* Court tightly focused its analysis on juvenile offenders serving LWOP sentences and did not consider "the thousands" of juveniles serving "multiple fixed-term sentences" that, in the aggregate, will exceed their natural life expectancies.

---

(…continued)

76 years to life imposed for five convictions arising from a burglary of an occupied dwelling and sexual assault committed when he was 17. The court assumed that *Graham*'s categorical rule would apply to the multiple sentences, but held that the sentence satisfied the "meaningful opportunity" requirement given that the defendant would be parole eligible at age 67. The Supreme Court of Colorado granted *certiorari* in that case, but the petition later was dismissed. *Lehmkuhl v. People*, 2014 WL 7331019.

*Id*. at *3.  The Court was not persuaded that "penological goals [were] not served by sentencing juveniles to multiple fixed term sentences."  *Id*. at *4.[15]

Three members of the court dissented.  They opined that *Graham* applies to aggregate term-of-years sentences for nonhomicide offenses that are so long that the juvenile offender is "likely to die in prison."  *Id*. at *7.  They noted that sentencing courts are fully "cognizant of the overall effect" of imposing sentences consecutively, so the likelihood that the offender will die in prison is not merely a "collateral result of sentencing the juvenile for multiple crimes."  *Id*. at *8.  The dissenters were persuaded by many of the cases we shall discuss *infra*, holding that the principles underlying *Graham* (and *Miller*) apply equally to aggregate term-of-years sentences.[16,17]

**2. *Graham* applies to any sentence imposed against a juvenile offender for a nonhomicide offense when the sentence exceeds the juvenile's natural life expectancy**

---

[15] The defendant was not entitled to relief under a recently enacted Missouri law permitting juvenile offenders serving LWOP sentences to apply for parole after serving 25 years.

[16] The defendant in *Willbanks* filed a petition for writ of *certiorari* in the United States Supreme Court on July 28, 2017.

[17] The Supreme Court of Missouri also decided a second, related case that day: *State v. Nathan*, __ S.W.3d __, 2017 WL 2952773 (Mo. 2017).  The defendant was convicted of second degree murder and multiple nonhomicide crimes arising from a home invasion robbery and murder he committed when he was 16 years old.  As modified on direct appeal, he was sentenced to four life terms, plus 45 years.  He challenged those sentences as violative of *Graham* and *Miller*.  The court rejected his argument, reasoning that *Graham* did not apply because the defendant was convicted of a homicide crime and *Miller* was inapplicable both because the court considered Nathan's age when imposing his sentences and because the sentences imposed were not mandatory and were not for LWOP.

Appellate courts in at least five other states—California, Florida, Nevada, Ohio, and New Jersey—have reached the opposite result, holding that *Graham* applies to aggregate term-of-years sentences imposed on juvenile offenders for multiple nonhomicide crimes when the sentences are the functional equivalent of LWOP. *See People v. Caballero*, 55 Cal.4th 262 (Cal. 2012); *Henry v. State*, 175 So.3d 675 (Fla. 2015), *cert. denied* __ U.S. __, 136 S.Ct. 1455 (2016); *Gridine v. State*, 175 So.3d 672 (Fla. 2015); *Kelsey v. State*, 206 So.3d 5 (Fla. 2016); *Johnson v. State*, 215 So.3d 1237 (Fla. 2017); *State v. Boston*, 363 P.3d 453 (Nev. 2015); *State v. Moore*, 76 N.E.3d 1127 (Ohio 2016), *petition for cert. filed*, No. 16-1167 (Mar. 22, 2017); *State v. Zuber*, 152 A.3d 197 (N.J. 2017), *petition for cert. filed*, No 16-1496 (June 12, 2017).[18] Two federal courts of appeal have reached the same conclusion on habeas review of state court

---

[18] Other state courts have held that *Miller* applies to lengthy term-of-years sentences imposed for *homicide* crimes committed by juvenile offenders that may exceed their natural life expectancy, thus entitling them to an individualized sentencing hearing. *See People v. Reyes*, 63 N.E.3d 884, 888 (Ill. 2016) ("*Miller* makes clear that a juvenile may not be sentenced to a mandatory, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation."); *Casiano v. Comm'r of Corr.*, 115 A.3d 1031, 1036 (Conn. 2015) (50-year sentence imposed for a homicide required the trial court to "engage in an individualized sentencing process that accounts for the mitigating circumstances of youth and its attendant characteristics"); *Bear Cloud v. State*, 334 P.3d 132, 141–42 (Wyo. 2014) ("*Roper/Graham/Miller* trilogy require sentencing courts to provide an individualized sentencing hearing to weigh the factors for determining a juvenile's 'diminished culpability and greater prospects for reform' when . . . the aggregate sentences result in the functional equivalent of life without parole."); *State v. Null*, 836 N.W.2d 41, 72 (Iowa 2013) (*Miller* "fully applicable" to an aggregate sentence of 75 years imposed for second degree murder and first degree robbery convictions).

adjudications.[19] *See Moore v. Biter,* 725 F.3d 1184 (9th Cir. 2013), *pet. for rehearing en banc denied*, 742 F.3d 917 (9th Cir. 2014); *Budder v. Addison*, 851 F.3d 1047 (10th Cir. 2017). All of these courts read *Graham* as a broad mandate that juvenile nonhomicide offenders receive a meaningful opportunity for release upon a showing of rehabilitation, regardless of whether a LWOP sentence was imposed or aggregate sentences amounting to LWOP were imposed. In some of these jurisdictions, that opportunity is realized by applying post-*Graham* statutory relief for LWOP sentences to lengthy term-of-years sentences; in others it is accomplished by judicial decree ordering sentence modification.

### California (2012): *People v. Caballero*, 55 Cal.4th 262

The defendant was 16 years old when he opened fire on three rival gang members, shooting one of them in the upper back. He was convicted of three counts of attempted murder and was found to qualify for statutory sentence enhancement. He was sentenced to 15 years to life, plus 25 years on the first count; and two consecutive terms of 15 years to life, plus 20 years on the second and third counts, resulting in an aggregate sentence of 110 years to life. He would not be parole eligible for over 100 years. He appealed, arguing that his sentence was unconstitutional under *Graham*.

The Supreme Court of California agreed. In its view, *Graham*'s central holding is that a juvenile nonhomicide offender must be given an opportunity during his or her

---

[19] As discussed, *supra*, the Sixth Circuit rejected a *Graham*-based challenge to multiple term-of-years sentences resulting in an aggregate sentence that exceeded a juvenile offender's natural life expectancy, holding that an Ohio appellate court's affirmance of those sentences was not "contrary to clearly established federal law." *See Bunch*, 685 F.3d at 550.

lifetime to "'demonstrate growth and maturity' to try to secure [his or her] release[.]" 55 Cal.4th at 268 (quoting *Graham*, 560 U.S. at 72-73). Because the aggregate sentences did not afford the defendant such an opportunity, they were cruel and unusual punishment. The court remanded for resentencing in light of "all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to [the defendant's] . . . chronological age at the time of the crime, whether [he] was a direct perpetrator or an aider and abettor, and his . . . physical and mental development." *Id*. at 268–69. After considering those factors, the court could "impose a time when the juvenile offender will be eligible to seek parole from the parole board." *Id*. at 269.

**Florida (2015, 2016, & 2017):** *Henry v. State*, 175 So.3d 675, *Gridine v. State*, 175 So.3d 672 , *Kelsey v. State*, 206 So.3d 5, & *Johnson v. State*, 215 So.3d 1237

In *Henry*, 175 So.3d 675, the defendant was "convicted for committing [as a juvenile] multiple nonhomicide offenses, including three counts of sexual battery while possessing a weapon, two counts of robbery, one count of kidnapping, one count of carjacking, one count of burglary of a dwelling, and one count of possession of marijuana." *Id*. at 676. He was sentenced to three concurrent terms of 30 years for the sexual batteries and additional sentences totaling 60 years to run consecutive for a total aggregate sentence of 90 years' imprisonment. He would become parole eligible at age 95.

On appeal, the Supreme Court of Florida resolved a split in authority among the Florida intermediate appellate courts on the impact, if any, of *Graham* on term-of-years sentences. It held that "the constitutional prohibition against cruel and unusual

punishment under *Graham* is implicated when a juvenile nonhomicide offender's sentence does not afford any 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" *Id*. at 679 (quoting *Graham*, 560 U.S. at 75). It reasoned that the *Graham* Court could not have had any "intention of limiting its new categorical rule to sentences denominated under the exclusive term of 'life in prison'" because, given that "juveniles are different," the penological goals served in sentencing adult offenders to lengthy prison terms would not necessarily be served by sentencing juvenile offenders to the same lengthy terms. *Id*. at 680. The court ordered that Henry be resentenced "in light of . . . new juvenile sentencing legislation enacted by the Florida legislature." *Id*.[20]

On the same day that the Supreme Court of Florida decided *Henry*, it also decided *Gridine v. State*, 175 So.3d 672 (Fl. 2015). Employing the same reasoning, it held that an aggregate 70-year sentence imposed for crimes committed when the defendant was 14 years old was cruel and unusual punishment. It remanded the case for the sentencing court to "conduct proceedings in accordance with *Henry*." 175 So.3d at 675.

In *Kelsey v. State*, 206 So.3d 5 (Fla. 2016), the Court extended *Henry* to juveniles whose LWOP sentences were vacated post-*Graham*, but who were resentenced prior to

---

[20] That legislation provided that, with certain exceptions not relevant here, a juvenile sentenced to a lengthy prison term shall "receive[] a review hearing after a designated number of years based on the crime for which the juvenile was convicted to allow the sentencing court the discretion to modify the sentence if the juvenile offender has demonstrated sufficient maturity and reform." *Peterson v. State*, 193 So.3d 1034, 1036 (Fla. Dist. Ct. App. 2016).

the enactment of the new juvenile resentencing legislation. Kelsey had been convicted of four offenses arising from a home burglary and rape he committed when he was 15 years old. His life sentences for two of those offenses were vacated post-*Graham* and he was resentenced to concurrent 45-year terms. He appealed from those sentences and the Supreme Court of Florida reversed, clarifying that its holding "that *Graham* does indeed apply to term-of-years sentences" was not limited to "'de facto life' sentences." *Id*. at 10. Rather, any juvenile nonhomicide offender sentenced to a lengthy term of years was entitled to the benefit of the judicial review mechanism adopted by the Florida legislature.

Most recently, in *Johnson v. State*, 215 So.3d 1237, 1242–43, the Florida Supreme Court further refined its holding in *Henry*, opining:

> [W]e must consider three factors when reviewing a juvenile nonhomicide offender's term-of-years sentence. Post–*Henry*, we must ensure that a juvenile nonhomicide offender does not receive a sentence that provides for release only at the end of a sentence (e.g. a 45–year sentence with no provision for obtaining early release based on a demonstration of maturity and rehabilitation before the expiration of the imposed term, such as in *Kelsey*). Secondly, we must ensure that a juvenile nonhomicide offender who is sentenced post-*Henry* does not receive a sentence which includes early release that is not based on a demonstration of rehabilitation and maturity (i.e. gain time or other programs designed to relieve prison overpopulation). Last, we must ensure that a juvenile nonhomicide offender who is sentenced post-*Henry* does not receive a sentence that provides for early release at a time beyond his or her natural life (e.g. a 1,000–year sentence that provides parole-eligibility after the offender serves 100 years). To qualify as a "meaningful opportunity for early release," a juvenile nonhomicide offender's sentence must meet each of the three parameters described in *Henry*.

**Nevada (2015):** *State v. Boston*, 363 P.3d 453

At age 16, the defendant committed a number of crimes, including kidnapping and "six counts of sexual assault with the use of a deadly weapon." 363 P.3d at 454. Upon conviction, he was sentenced to "14 consecutive life terms with the possibility of parole, plus a consecutive term of 92 years in prison." *Id.* He filed a petition for writ of habeas corpus, which was granted, and the State appealed.

The Supreme Court of Nevada addressed "whether the holding in *Graham* applies when an aggregate sentence imposed against a juvenile offender convicted of more than one nonhomicide offense is the equivalent of a life-without-parole sentence." *Id.* It concluded that "the *Graham* rule applies to aggregate sentences that are the functional equivalent of a sentence of life without the possibility of parole." *Id.* at 457. Although "*Graham* provides no direction" on this issue, the *Graham* Court did not "specifically limit its holding to offenders who were convicted for a single nonhomicide offense." *Id.* The court reasoned that permitting courts to impose sentences on juvenile nonhomicide offenders that are the functional equivalent of LWOP will "undermine the [Supreme] Court's goal of 'prohibit[ing] States from making the judgment at the outset that those offenders never will be fit to reenter society.'" *Id.* (quoting *Graham*, 560 U.S. at 75). Because the defendant's sentence of almost 100 years was "without a doubt the

functional equivalent of a sentence of life without the possibility of parole[,]" *id.* at 458, the court did not analyze at what point a term-of-years sentence attains that status.[21]

**Ohio (2016):** *State v. Moore*, 76 N.E.3d 1127

When he was 15 years old, the defendant "embarked on a criminal rampage of escalating depravity," robbing a man and woman at gunpoint before carjacking another woman, robbing her, and raping her repeatedly.[22] 76 N.E.3d at 1128. He was convicted of twelve offenses, including three counts each of aggravated robbery and rape and one count of kidnapping. The court sentenced him to the "maximum prison term for each count," resulting in an aggregate sentence of 141 years, which was subsequently reduced to 112 years. *Id*. at 1130. He would be eligible for parole at age 92, after serving 77 years of that sentence.

On appeal, the Supreme Court of Ohio held that a minimum sentence for a juvenile nonhomicide offender "that extends beyond the life expectancy of the offender," is unconstitutional. *Id*. at 1134. It construed *Graham* as "protect[ing] juveniles

---

[21] The court noted that while the appeal was pending, the Nevada legislature had passed a bill providing "juvenile offender[s] parole eligibility after 15 years of incarceration 'for having been convicted of an offense or *offenses* that did not result in the death of a victim.'" *State v. Boston*, 363 P.3d at 459 (citation omitted; emphasis in *Boston*). The court adhered to its holding "that *Graham* precludes aggregate sentences that constitute the functional equivalent of life without the possibility of parole against nonhomicide juvenile offenders." *Id.* In light of this new law, it vacated the trial court's grant of habeas corpus relief "because the judiciary [could not] provide him with a better solution than that which the Legislature ha[d] already provided." *Id.*

[22] Moore's accomplice and co-defendant was Chaz Bunch, whose federal habeas petition we discussed, *supra*.

categorically from a final determination while they are still youths that they are irreparably corrupt and undeserving of a chance to reenter society." *Id*. at 1136. It noted that although *Graham* does not guarantee a juvenile nonhomicide offender release during his or her lifetime, it requires that such an offender be given a "'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" *Id*. at 1137 (quoting *Graham*, 560 U.S. at 75). It found that a sentence that merely allows such offenders to "breathe their last breaths as free people" is not the "meaningful opportunity" envisioned by the *Graham* Court. *Id*. Rather, a juvenile nonhomicide offender must be given an opportunity to show that he or she is entitled to be released to "live part of [his or her] li[fe] in society." *Id*. For that reason, *Graham* applies equally to sentences of LWOP and the functional equivalent of LWOP. As the defendant's first opportunity for release would be at age 92, "well beyond his life expectancy," his sentence was a "punishment that remove[d] [him] from society without a meaningful chance to demonstrate rehabilitation and obtain release" and "lacked penological justification." *Id*. at 1139–40.

Rejecting the argument that *Graham* was not meant to apply to "multiple, consecutive fixed-term sentences for nonhomicide offenses[,]" the court noted that Graham himself had committed multiple offenses, although his LWOP sentence was imposed for just one offense. *Id*. at 1141. It emphasized that even though the sentencing court in *Graham* had taken Graham's criminal proclivities into account, the Supreme Court had reasoned that "'it [did] not follow that he would be a risk to society for the rest

of his life.'"  *Id*. at 1141–42 (quoting *Graham*, 560 U.S. at 73.)  By imposing a categorical rule for all juveniles convicted of nonhomicide offenses, the *Graham* Court had rejected a "case-by-case approach" that would permit courts to impose life sentences for juveniles who committed "'particularly heinous crimes.'"  *Id*. at 1142 (quoting *Graham*, 560 U.S. at 77).  "Whether the sentence is the product of a discrete offense or multiple offenses, the fact remains that it was a *juvenile* who committed the one offense or several offenses and who has diminished moral culpability."  *Id*. (emphasis in original).  The court vacated the defendant's sentence and remanded for "resentencing in conformity with *Graham*."  *Id*. at 1149.[23]

**New Jersey (2017):** *State v. Zuber*, 152 A.3d 197

In two consolidated appeals, the Supreme Court of New Jersey held that *Graham* applies to "sentences that are the practical equivalent of [LWOP]."  152 A.3d at 201.  In one case, the defendant participated in two separate gang rapes when he was 17.  He was convicted of 10 offenses and was sentenced, "in the aggregate, to 150 years in prison with a 75-year period of parole ineligibility."  *Id*. at 202.  His sentence later was reduced to 110 years, with 55 years of parole ineligibility.  He would become parole eligible at age 72.  In the other case, the defendant was 17 when he participated in four armed robberies.  He was convicted of "multiple counts related to the robberies, including one count of felony murder."  *Id*. at 203.  He was sentenced to an aggregate term of 75 years

---

[23] As noted, in *Moore* the State of Ohio filed a petition for writ of *certiorari* with the Supreme Court.  It remains pending, and has been scheduled for discussion at the Court's September 25, 2017 conference.

in prison, with 68 years and 3 months of parole ineligibility. He would become parole eligible at age 85.

In the aftermath of *Graham*, both defendants filed motions to correct illegal sentences. The cases reached the Supreme Court of New Jersey, which consolidated them for decision. The court found that it makes no practical difference whether a juvenile offender receives a "formal" sentence of LWOP or receives "multiple term-of-years sentences that, in all likelihood, will keep him in jail for the rest of his life[.]" *Id*. at 211. The constitutionality of the sentence should not turn on its "label." *Id*. at 212. The court determined that each defendant's aggregate sentence was sufficiently lengthy to "trigger the protections of *Miller* under the Federal and [New Jersey] Constitutions."[24] *Id*. at 213. Because the "focus at a juvenile's sentencing hearing belongs on the real time consequences of the aggregate sentence," the sentencing court must consider the "*Miller* factors" whether it is sentencing the juvenile to a lengthy term-of-years sentence for a single offense or is sentencing the juvenile to multiple term-of-years sentences for multiple offenses resulting in a lengthy period of parole ineligibility. *Id*. at 212. The court directed "judges to exercise a heightened level of care before imposing multiple consecutive sentences on juveniles." *Id*. at 214. It also urged the New Jersey legislature

---

[24] As discussed, in *Miller* the Supreme Court held that a juvenile *homicide* offender cannot be sentenced to a *mandatory* LWOP and that a sentencing court must take into account the juvenile's age and maturity in fashioning a sentence. Because one of the defendants was convicted of felony murder, the *Zuber* court frequently discussed *Miller* rather than *Graham*.

to "enact[] a scheme that provides for later review of juvenile sentences with lengthy periods of parole ineligibility[.]" *Id*. at 215.

**Ninth Circuit (2014):** *Moore v. Biter*, 725 F.3d 1184

At age 16, the defendant "sexually victimize[d] four separate women on four occasions during a five-week period." *Id*. at 1186. He was convicted by a California state court of

> twenty-four counts: nine counts of forcible rape, seven counts of forcible oral copulation, two counts of attempted second degree robbery, two counts of second degree robbery, forcible sodomy, kidnaping with the specific intent to commit a felony sex offense, genital penetration by a foreign object, and the unlawful driving or taking of a vehicle. The jury found that [the defendant] also used a firearm while committing his crimes.

*Id*. The court imposed 24 consecutive sentences totaling 254 years and 4 months. He would have to live to the age of 144 to be parole eligible.

After *Graham* was decided, the defendant filed a state habeas petition challenging the constitutionality of his sentence. The trial court denied his petition, the intermediate appellate court affirmed, and the Supreme Court of California summarily denied review.[25] He then filed his federal habeas petition, which reached the Ninth Circuit.

The court held that the California court's failure to apply *Graham* to the defendant's sentences was contrary to clearly established federal law. It concluded that the sentences were "materially indistinguishable from the sentence in *Graham*" because the defendant would remain in prison for the rest of his life without a "meaningful

---

[25] *Caballero, supra*, had not yet been decided.

opportunity" to demonstrate any entitlement to release. *Id*. at 1191. It reasoned that the nonhomicide crimes he committed could not be distinguished in any principled way from those at issue in *Graham*, because the *Graham* Court "drew only one line that was crime-specific: it distinguished between homicide and nonhomicide crimes." *Id*. at 1192. The trial court's sentence was the equivalent of LWOP and was imposed for nonhomicide crimes against a juvenile offender. It therefore was unconstitutional.

The State filed a petition for rehearing and a petition for rehearing *en banc*. The *en banc* petition was considered by the entire court and was denied. In a published opinion dissenting from the denial, Judge Diarmuid O'Scannlain, joined by six judges, criticized the majority for "failing to distinguish one 'life without parole' sentence from multiple 'term-of-years' sentences." 742 F.3d at 917. The defendant had committed four separate rapes over five weeks and had been convicted of 24 separate crimes; and no single sentence exceeded eight years. In the view of the dissenting judges, it was plain that the *Graham* Court's analysis only concerned actual LWOP sentences. That was the "'sentencing practice'" the *Graham* Court determined was "'exceedingly rare.'" *Id*. at 919 (quoting *Graham*, 560 U.S. at 67). The *Graham* Court did not even "consider the prevalence of sentences like [the defendant's]—lengthy term-of-years sentences adding up to *de facto* life imprisonment." *Id*. Given that the *Graham* Court did not include such sentences in its analysis, the dissenters concluded that it did not intend to include them within its categorical bar.

**Tenth Circuit (2017):** *Budder v. Addison*, 851 F.3d 1047

The defendant was 16 when he stabbed a 17-year-old girl multiple times, raped her repeatedly, and forced her to fellate him. He was convicted by an Oklahoma state court of two counts of first degree rape; one count of assault and battery with a deadly weapon; and one count of forcible oral sodomy. He was sentenced to LWOP for each rape conviction, life with parole for assault and battery, and 20 years for forcible oral sodomy, all to run consecutively. Less than two weeks later, *Graham* was decided. On direct appeal, the defendant's LWOP sentences were modified to life with parole. The sentences still were to run consecutively. The defendant challenged his sentences again, arguing that because he would have to serve 131.75 years in prison to be eligible for parole, they still violated *Graham*. The state court held that the defendant's multiple, consecutive term-of-years sentences did not violate *Graham*.

On consideration of the defendant's federal habeas petition premised on the same argument, the Tenth Circuit reversed. In its view, the *Graham* Court's decision to impose a categorical bar rested on "(1) the 'sentencing practice'; (2) 'the nature of the offense'; and (3) 'the characteristics of the offender.'" *Id*. at 1055 (quoting *Graham*, 560 U.S. at 60-61)). The court understood the "sentencing practice" at issue in *Graham* to "include[] any sentence that would deny the offender a realistic opportunity for release in the offender's lifetime." *Id*. It pointed out that Graham himself had been sentenced to life in prison, and it was only because the State of Florida had abolished its parole system that his sentence was treated as LWOP. It opined that the protections afforded by the

-36-

Eighth Amendment cannot depend upon the label applied to a sentence. The "nature of the offense" is any "nonhomicide" crime committed by a juvenile, regardless of the "number or severity of nonhomicide crimes committed." *Id*. at 1057. *Graham* did not "draw any distinction[]" in that regard and, in fact, "specifically referred to offenders with multiple crimes and multiple charges, including Budder [the defendant] himself." *Id*.[26] In the court's view, the *Graham* Court intended to put an end to the "case specific approach" to sentencing that allows a court to impose a sentence equivalent to LWOP by aggregating multiple, consecutive term-of-years sentences for crimes it considers "'particularly heinous.'" *Id*. at 1058 (quoting *Graham*, 560 U.S. at 77)). Finally, "the characteristics of the offender" encompasses any offender who was a juvenile when he or she committed the nonhomicide offense(s) because *Graham* recognized that those offenders are less culpable and the penological goals ordinarily served by LWOP sentences are not served for them.

---

[26] This comment is not entirely accurate. In the section of *Graham* discussing the *Juvenile LWOP Study*, the Court referenced a May 4, 2010 article in *Tulsa World* stating that "since the study was completed, a defendant in Oklahoma has apparently been sentenced to [LWOP] for a rape and stabbing he committed at the age of 16." 560 U.S. at 64. This was the reference to Budder. Thus, Budder was included in the *Graham* Court's analysis because he was, in fact, serving a sentence (actually two) of LWOP at that time. As discussed, Budder's LWOP sentences were modified *after Graham* was decided. So, when Budder's appeal was before the Tenth Circuit, he no longer was in the category of juvenile offenders sentenced to LWOP that he had been in when *Graham* was decided. The *Graham* Court did not include Budder in its analysis because he was serving multiple term-of-years sentences that could exceed his life expectancy but because, at that time, he was serving an actual LWOP sentence.

The Tenth Circuit concluded that because the defendant "committed his crimes as a juvenile . . . did not commit homicide[, and] . . . received a life sentence . . . [that] does not provide him a realistic opportunity for release," his sentence violated "the categorical rule clearly established in *Graham*" and the Oklahoma appellate court erred by holding otherwise. *Id*. at 1059. It reversed and remanded with "instructions to grant [the defendant's] petition for writ of habeas corpus, . . . vacate [his] sentence, and to direct the State of Oklahoma to resentence [him]." *Id*. at 1060.

3. **Cases holding that *Graham* may apply to a lengthy term-of-years sentence for one offense (but not multiple offenses)**

Finally, some state courts have addressed whether *Graham* applies to a lengthy term-of-years sentence for a *single* nonhomicide offense, reaching different results depending upon the length of the sentence imposed. In *State v. Smith*, 892 N.W.2d 52 (Neb. 2017), *petition for cert. filed*, No. 16-9416 (May 30, 2017),[27] the defendant was 16 years old when he and an accomplice robbed a doughnut shop, kidnapped a female employee, sexually assaulted her, and killed her. He plead guilty to kidnapping and burglary, and ultimately was sentenced to 90 years to life. He filed a habeas petition, arguing that his sentence for kidnapping violated *Graham*. The Supreme Court of Nebraska upheld the sentence. It found that because the defendant would be eligible for parole at age 62, the sentence "satisf[ied] the 'meaningful opportunity' requirement" of *Graham*. *Id*. at 65. Moreover, the sentencing court had considered the relevant

---

[27] The petition for *certiorari* has been scheduled for discussion at the September 25, 2017 Supreme Court conference, along with the petition in *Moore, supra*.

mitigating factors and the sentence was not otherwise unconstitutionally excessive relative to the crime of kidnapping.

In *State ex rel. Morgan v. State*, 217 So.3d 266 (La. 2016), the defendant was convicted of an armed robbery he committed at age 17, and was sentenced to 99 years imprisonment without parole. He filed a motion to correct illegal sentence, under *Graham*, which was denied. On appeal, he argued that his sentence was the functional equivalent of LWOP. The State countered that the court's precedent in *Brown, supra,* was dispositive.

The Louisiana Supreme Court distinguished *Brown.* In that case, the defendant had been "convicted of five offenses resulting in five consecutive sentences which, when aggregated, resulted in a term pursuant to which he would have no opportunity for release." *Id*. at 271–72. By contrast, "the defendant [in the case before it] was convicted of a single offense and sentenced to a single term which affords him no opportunity for release." *Id.* at 272. The court found there to be no difference between a 99-year sentence without parole for one crime and a LWOP sentence for one crime; therefore, the sentence at issue was "the functional equivalent of life without parole." *Id*. at 277. It noted that even if the 99-year sentence was changed to be with parole, the defendant would not be eligible for release until age 101. The court remedied the situation by determining that the defendant qualified for relief under a post-*Graham* Louisiana statute

making all juvenile offenders serving life sentences for nonhomicide offenses eligible for parole after serving 30 years of their sentences.[28]

**D**.

In Maryland, a court may "correct an illegal sentence at any time." Md. Rule 4-345(a). An illegal sentence is "one in which the illegality 'inheres in the sentence itself; *i.e.*, there either has been no conviction warranting any sentence for the particular offense or the sentence is not a permitted one for the conviction upon which it was imposed and, for either reason, is intrinsically and substantively unlawful.'" *Colvin v. State*, 450 Md. 718, 725 (2016) (quoting *Chaney v. State*, 397 Md. 460, 466 (2007)). We review the denial of a motion to correct an illegal sentence *de novo*. *See Carlini v. State*, 215 Md. App. 415, 443 (2013) (whether a sentence "is or is not inherently illegal" is "quintessentially a question of law calling for *de novo* appellate review").

The appellant does not argue that any of the sentences imposed—25 years for each first degree assault conviction—standing alone, is illegal. He concedes that all are within the statutory range permitted by law. *See* Md. Code (2002, 2004 Supp.), § 3-202(b) of the Criminal Law Article. Nor does he argue that any one sentence is grossly excessive. He maintains, however, that the aggregate term of 100 years resulting from the sentences being imposed consecutively is a functional LWOP sentence imposed against a juvenile

---

[28] On June 29, 2017, the Supreme Court of Louisiana decided that *Graham* likewise applies to invalidate a LWOP sentence imposed against a recidivist juvenile offender for a nonhomicide crime under the state's "Habitual Offender Law." *State v. Green*, __ So.3d __, 2017 WL 2836173 (La. 2017).

nonhomicide offender, which is unconstitutional under *Graham*; and an unconstitutional sentence is an illegal sentence. *See Walker v. State*, 53 Md. App. 171, 187 (1982) (sentencing court had broad discretion to impose any legal sentence for common law crime, meaning any sentence that was not "unconstitutional"). Having considered the *Graham* decision itself and the cases, discussed above, addressing the implications of *Graham* for term-of-years sentences for juveniles convicted of nonhomicide crimes, we conclude that *Graham* does not apply. The appellant's aggregate sentence of 100 years is not unconstitutional and therefore is not illegal.

The Supreme Court's decision in *Graham* to impose a categorical bar against LWOP sentences for juvenile nonhomicide offenders was a singular departure from its established Eighth Amendment sentencing jurisprudence, which until then only had adopted categorical restrictions against imposition of the death penalty. LWOP for juvenile nonhomicide offenders was the only sentencing practice explored and evaluated by the *Graham* Court.[29] Its analysis was bound up in that particular sentencing practice. The Court "conducted no analysis of sentences for multiple convictions" and the analysis it did conduct "provides no guidance on how to handle such sentences." *Brown*, 118 So.3d at 341.

---

[29] We disagree with those courts that have stated that because Graham was convicted of crimes in addition to armed robbery, the Supreme Court was addressing multiple conviction sentences. The only sentence that was under consideration in *Graham* was the sentence of life imprisonment for armed robbery; and the sentence clearly was for LWOP because, as we have stated, the sentencing court knew there was no parole system in place when the sentence was imposed.

At the outset of its constitutional inquiry, the Court examined whether there were "objective criteria" of an evolving national consensus against sentencing juvenile offenders to LWOP for nonhomicide crimes. *Graham*, 560 U.S. at 61. As discussed, in finding that there was, the Court relied upon the *Juvenile LWOP Study* and its own research, which showed that in the entire country only 123 juvenile offenders were serving LWOP sentences for nonhomicide crimes. The Court did not take into account any aggregate term-of-years sentences, including those for a cumulative number of years exceeding the juvenile's life expectancy, which could be considered the functional equivalent of LWOP. (And of course, having not considered that, the Court did not consider age at the time of parole eligibility.)[30]

Indeed, the Court rejected the State of Florida's argument that it should include in its analysis juvenile offenders sentenced to LWOP for nonhomicide *and* homicide crimes. In the Court's eyes, those cases did not accurately reflect the national consensus on the specific sentencing practice under consideration because those defendants likely were being "punished in part for the homicide when the judge [made] the sentencing determination [about the nonhomicide crime]." *Id*. at 63. The Court narrowly tailored its

---

[30] Table A of the Juvenile LWOP Study lists the number of juveniles serving LWOP sentences for nonhomicide crimes in each State for which data was available in 2009. The number of juveniles serving such a sentence in Maryland was zero. At that time, the appellant was in prison serving the sentences in question here, so his multiple-conviction multiple term-of-years sentence obviously was not considered. Neither were the sentences in *Lucero* and *Rainer*, as the list gives the number of juvenile lifers in Colorado as zero. And it lists no such juveniles in New Jersey (*Zuber*) or Missouri (*Willbanks*).

analysis to the particular sentencing category at issue: LWOP imposed against a juvenile offender for one nonhomicide crime. The emerging national consensus the Court found to exist was against sentencing juveniles to LWOP for a single nonhomicide crime. It made no finding of such a consensus against the practice of sentencing juveniles to multiple term-of-years sentences for multiple nonhomicide crimes when the sentences, in the aggregate, exceed the defendant's life expectancy.

In addition, nothing in the *Graham* Court's analysis touched upon whether such sentences serve penological justifications that are not served when the defendant is convicted and sentenced for a single crime. We think it plain that they do. The "'heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender.'" *Id.* at 71 (quoting *Tison*, 481 U.S. at 137). To be sure, as the Court already had held in *Roper* and reaffirmed in *Graham*, as a general class of offenders juveniles are less culpable than adults. Within the world of juvenile offenders, however, one who commits multiple nonhomicide crimes against multiple victims, causing injury to each victim, is more culpable than one who commits the same injury-producing crime against one victim. In *Brown v. State*, 311 Md. 426, 435 (1988), the Court of Appeals stated the common sense proposition that "[p]unishment for criminal conduct should be commensurate with responsibility and *a defendant who terrorizes multiple persons with a handgun is more culpable than a defendant who terrorizes only one*." (Emphasis added.) That proposition is no less applicable among juvenile nonhomicide offenders and does not become inapplicable merely because

juvenile offenders as a group are less culpable than adult offenders.  We agree with the courts in *Kasic* and *Willbanks* that "different considerations apply to consecutive term-of-years sentences based on multiple counts and multiple victims[,]" *Kasic*, 265 P.3d at 415–16; and that *Graham* did not hold that "penological goals [were] not served by sentencing juveniles to multiple fixed-term sentences." *Willbanks*, 2017 WL 2952445 at *4.

The *Graham* Court emphasized that the rarity of LWOP sentences for juvenile nonhomicide offenders in jurisdictions permitting such sentences lessened the deterrent effect of those sentences.  *Graham*, 560 U.S. at 72 (remarking that juveniles are less easily deterred by the threat of punishment and that this is "particularly so when that punishment is rarely imposed").  By contrast, the practice of imposing consecutive term-of-years sentences that cumulatively produce a lengthy aggregate sentence is not rare. *See Willbanks*, 2017 WL 2952445 at *3 (*Graham* Court's analysis did not touch upon "the thousands" of juveniles serving "multiple fixed-term sentences").  Thus the deterrent effect of those sentences has not been diminished in the same way.

Nor does the practice of imposing cumulative term-of-years sentences for multiple offenses reflect an "irrevocable judgment" that a juvenile nonhomicide offender has no capacity for change.  *Graham,* 560 U.S. at 74.  Rather, it reflects a series of judgments that for each offense a particular term-of-years sentence within the statutory limit serves the goals of "punishment, deterrence, and rehabilitation*." See Jennings v. State*, 339 Md. 675, 682 (1995); *Lucero*, 394 P.3d at 1133 ("each sentence is a separate punishment for a

separate offense"). Viewing the sentences this way adheres to the established case law holding that Eighth Amendment proportionality review must address each individual sentence imposed, not the aggregate sentence that results. In *O'Neil v. Vermont*, 144 U.S. 323 (1892), where the sentencing court imposed 307 consecutive sentences for liquor law violations, the Supreme Court quoted, in *dicta*, from the sentencing court's remarks:

> "It would scarcely be competent for a person to assail the constitutionality of the statute prescribing a punishment for burglary, on the ground that he had committed so many burglaries that, if punishment for each were inflicted on him, he might be kept in prison for life. The mere fact that cumulative punishments may be imposed for distinct offences in the same prosecution is not material upon this question. If the penalty were unreasonably severe for a single offence, the constitutional question might be urged; but here the unreasonableness is only in the number of offences which the respondent has committed."

*Id*. at 331.

As the Supreme Court of Minnesota recently observed in *State v. Ali*, 895 N.W.2d 237 (Minn. 2017), the *O'Neil* Court's *dicta* has been widely followed by state and federal courts in assessing proportionality challenges under the Eighth Amendment.[31] *See Hawkins v. Hargett*, 200 F.3d 1279, 1285 n.5 (10th Cir. 1999) ("The Eighth Amendment

---

[31] *Ali* involved a *Miller* challenge to three consecutive life sentences imposed against a juvenile offender for one count of first degree premeditated murder and two counts of felony murder. The life sentence for premeditated murder was a mandatory LWOP. The Supreme Court of Minnesota vacated that sentence, *State v. Ali*, 855 N.W.2d 235 (Minn. 2014), and remanded for a "*Miller* hearing." The trial court did not hold a *Miller* hearing because the State stipulated to all three life sentences being with parole. When the case returned to the Supreme Court of Minnesota, it held that *Miller* did not apply to multiple consecutive sentences that, in the aggregate, are the functional equivalent of a LWOP sentence.

analysis focuses on the sentence imposed for each specific crime, not on the cumulative sentence for multiple crimes.");[32] *United States v. Aiello*, 864 F.2d 257, 265 (2d. Cir. 1988) (same); *State v. Berger*, 134 P.3d 378, 384 (Ariz. 2006) (affirming the imposition of 20 consecutive 10-year sentences for separate convictions for possession of child pornography and remarking that, "as a general rule, this court 'will not consider the imposition of consecutive sentences in a proportionality inquiry . . . .'") (quoting *State v. Davis*, 79 P.3d 64, 74 (Ariz. 2003)); *see also Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001) (affirming the imposition of cumulative disciplinary sanctions against a prisoner, opining that "it is wrong to treat stacked sanctions as a single sanction. To do so produces the ridiculous consequence of enabling a prisoner, simply by recidivating, to generate a colorable Eighth Amendment claim").

An appellate court's holding necessarily incorporates the factual and procedural context for the issue before it. In our view, the courts that read *Graham* to "hold" that *all* juvenile nonhomicide offenders must be given an opportunity to seek release at some time, regardless of the individual circumstances (and for some courts, early enough that they can build a life for themselves) are interpreting the case well beyond its actual holding. The holding of *Graham* is that a juvenile convicted of one nonhomicide crime

---

[32] *Hawkins* involved a pre-*Graham* Eighth Amendment challenge to a juvenile offender's 100 year aggregate sentence for four crimes. The Tenth Circuit ruled that the sentence was not cruel and unusual despite the defendant's age at the time of the commission of the crimes (13), reasoning, in part, that the length of the sentence would be reduced significantly by good time credits resulting in an active sentence of just over 35 years.

may not be given a LWOP sentence that from the outset affords him no opportunity to obtain release based on growth and maturity. Given the very different considerations that are in play when a juvenile commits multiple nonhomicide crimes against multiple victims and receives multiple term-of-years cumulative sentences, each of which individually is not grossly disproportionate, we cannot say that the Supreme Court's holding in *Graham* is implicated. This is not a "same sentence different label" situation. Moreover, the rarity of the Supreme Court's decision in *Graham* to impose a categorical restriction outside the context of the death penalty militates in favor of a narrow construction of its categorical bar.

We hold that *Graham*'s categorical bar on the imposition of LWOP sentences against juvenile nonhomicide offenders does not apply to a sentence such as the appellant's sentence that comprises multiple sentences imposed for multiple crimes against multiple victims, where no sentence individually is lengthy enough to trigger a *Graham*-based challenge. Sentences of this sort were not addressed by the *Graham* Court and are dissimilar from a LWOP sentence (or even a lengthy term-of-years sentence) imposed for a single offense in terms of the penological goals being served. The appropriate Eighth Amendment analysis when there are multiple nonhomicide crimes committed by a juvenile against multiple victims, with no single sentence for LWOP, is whether, upon consideration of all the relevant circumstances (including the age of the offender), each individual sentence is grossly disproportionate to the crime for which it was imposed.

Even if we were to adopt the appellant's position that *Graham* applies to multiple term-of-years sentences, we nevertheless would hold that the sentences imposed here are not cruel and unusual. The appellant may seek release on parole when he is 67 years old. Most of the cases holding that *Graham* applies to cumulative term-of-years sentences dealt with much longer periods of parole ineligibility that plainly exceeded the defendant's life expectancy. *See Caballero* (age 116); *Boston* (age 116); *Morgan* (age 101); *Henry* (age 95); and *Moore* (age 92). As the appellant tacitly acknowledges, age 67 is less than his average life expectancy. Therefore, his sentences only would amount to a *de facto* LWOP sentence if we were to adopt the reasoning of those courts that have held that *Graham* mandates not only that a juvenile nonhomicide offender be afforded an opportunity for release within his or her lifetime but also an "'opportunity to truly reenter society or have a[] meaningful life outside of prison.'" *Moore*, 76 N.E.3d at 1146 (quoting *Casiano v. Comm'r of Corrections*, 115 A.3d 1031 (Conn. 2015)).[33]

In discussing the harshness of a sentence of LWOP, the *Graham* Court emphasized that that sentence means the juvenile offender will "'remain in prison for the rest of his days,'" 560 U.S. at 70 (quoting *Naovarath*, 779 P.2d at 944). The sentence is

---

[33] The appellant includes in his brief a long passage from the Supreme Court of Connecticut's decision in *Casiano*, 115 A.3d 1044, discussing the fact that while, at the time, the average life expectancy for a male in the United States in 2015 was 76, people living in prison have a reduced life expectancy. The *Casiano* court reasoned that a lengthy term-of-years sentence that does not exceed a juvenile offender's life expectancy but results in the loss of opportunities to integrate into society is infirm under *Graham* and *Miller*. In the case at bar, no evidence bearing on the appellant's life expectancy was included with his motion to correct illegal sentence, however.

an "irrevocable" "forfeiture" of a juvenile offender's "most basic liberties without giving hope of restoration." *Id*. at 69–70. The *Graham* Court clarified that while a state is not required to "guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime," it must grant him or her a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id*. at 75. The Court did not specify when that opportunity must be conferred, instead giving deference to the states to fashion sentencing schemes that provide some opportunity for release. *See Virginia v. LeBlanc*, __ U.S. __, 137 S.Ct. 1726, 1727–29 (2017) (holding that the Supreme Court of Virginia's determination that its geriatric release program provided a "meaningful opportunity" for release was not "'contrary to . . . clearly established federal law'") (quoting 28 U.S.C. § 2254(d)(1)). Each 25-year sentence imposed against the appellant includes the benefit of parole when he has served half of his sentence. While the appellant might not be released during his lifetime, he will have the opportunity to apply for parole when he is 67, which we cannot say is inconsistent with the Supreme Court's "meaningful opportunity" language in *Graham*. *See Smith*, 892 N.W.2d at 52 (sentence affording juvenile offender parole eligibility at age 62 satisfies *Graham*); *Lehmkuhl*, 369 P.3d at 635 (parole eligibility at age 67 satisfies *Graham*).

We now turn to the appellant's argument, premised largely upon the Fourth Circuit's since reversed decision in *LeBlanc*, that under no circumstance will he ever be afforded a "meaningful opportunity" for release under Maryland's parole system because that system does not treat maturity and rehabilitation as the dispositive factors for

granting parole for juvenile offenders. We disagree with the State that this argument is not cognizable on a motion to correct an illegal sentence, but agree that it lacks merit.

CS section 7-305 lists ten factors that the Parole Commission shall consider in deciding whether to grant parole. They include:

> (2) the physical, mental, and moral qualifications of the inmate;
> (3) the progress of the inmate during confinement . . .;
>
> ***
>
> (5) whether there is reasonable probability that the inmate, if released on parole, will remain at liberty without violating the law;
> (6) whether release of the inmate on parole is compatible with the welfare of society;

The COMAR regulations implementing CS section 7-305 go even further, requiring the Parole Commission to consider additional factors when a prisoner applying for parole "committed [his or her] crime[s] as a juvenile." Those additional factors include:

> (a) Age at the time the crime was committed;
>
> (b) The individual's level of maturity and sense of responsibility at the time the crime was committed;
>
> (c) Whether influence or pressure from other individuals contributed to the commission of the crime;
>
> (d) Whether the prisoner's character developed since the time of the crime in a manner that indicates the prisoner will comply with the conditions of release;
>
> (e) The home environment and family relationships at the time the crime was committed;
>
> (f) The individual's educational background and achievement at the time the crime was committed; and

(g) Other factors or circumstances unique to prisoners who committed crimes at the time the individual was a juvenile that the Commissioner determines to be relevant.

COMAR 12.08.01.18A(3). These factors necessarily encompass the maturity and rehabilitation considerations discussed in *Graham*. There is nothing in *Graham* that suggests that they must be the *only* factors considered by a parole authority in deciding whether a juvenile offender will be released. *See Graham*, 560 U.S. at 75 (remarking that those who "commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives").

Finally, we note that the appellant's sentences are not excessively disproportionate to the crimes he committed, under traditional proportionality review. "[C]hallenges based on proportionality will be seriously entertained only where the punishment is truly egregious." *Thomas v. State*, 333 Md. 84, 97 (1993). Here, the appellant and his accomplice shot a gun twelve times into a crowd of teenagers outside a high school, seriously injuring four victims, one of whom was left permanently paralyzed. He was convicted of four counts of first degree assault, one against each victim, and was sentenced to a 25-year term for each conviction. The sentencing court found that these sentences—the maximum permitted by statute—were warranted by the particularly heinous nature of the crimes. It noted that the gravity of the offenses was severe and the potential for much greater harm was high. The crime instilled fear in the community at large and had long-lasting repercussions for the victims and their families and friends.

The sentences imposed were not egregious and do not give rise to an inference of gross disproportionality.

Because the appellant's 100-year aggregate sentence does not fall within the categorical bar imposed by *Graham* and because the sentences are not otherwise unconstitutionally excessive relative to the crimes committed, they are not illegal as cruel and unusual punishment under the Eighth Amendment or Article 25 of the Maryland Declaration of Rights.[34] The circuit court did not err by denying the appellant's motion to correct illegal sentence.

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

---

[34] The "cruel or unusual punishments" clause of Article 25 of the Maryland Declaration of Rights has long been construed to have the same meaning as the Cruel and Unusual Punishments Clause of the Eighth Amendment. *See, e.g., Thomas*, 333 Md. at 103 n.5 ("[W]e perceive no difference between the protection afforded by [the Eighth Amendment] and by the 25th Article of our Declaration of Rights"); *Walker v. State*, 53 Md. App. 171, 183 (1982) (Eighth Amendment and Article 25 are construed to have the same meaning because "both of them were taken virtually verbatim from the English Bill of Rights of 1689"). Accordingly, there is no basis for the appellant's argument that he is afforded greater protections by Article 25 of the Maryland Declaration of Rights than by the Eighth Amendment.