J-A05018-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| IVORY KING | : | |
| | : | |
| Appellant | : | No. 406 EDA 2023 |

Appeal from the Judgment of Sentence Entered November 21, 2022
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0003727-1998

BEFORE: DUBOW, J., KING, J., and LANE, J.

MEMORANDUM BY KING, J.:               **FILED OCTOBER 11, 2024**

Appellant, Ivory King, appeals from the judgment of sentence entered in the Bucks County Court of Common Pleas, following his resentencing for four counts of first-degree murder.[1] We affirm.

The relevant facts and procedural history of this case are as follows. Appellant was 17 years old when he shot and killed four individuals and injured a fifth individual at a Memorial Day party on May 23, 1998. On October 26, 1998, Appellant entered an open guilty plea to four ungraded counts of murder, one count of aggravated assault, and various related offenses. After conducting a degree-of-guilt hearing, the trial court found Appellant guilty of four counts of first-degree murder.

_____

[1] 18 Pa.C.S.A. § 2502(a).

On October 28, 1998, the court conducted a sentencing hearing. Appellant did not exercise his right to allocution. The court imposed four consecutive sentences of life without parole ("LWOP") for the murder convictions.

Appellant filed a petition pursuant to the Post Conviction Relief Act ("PCRA") on July 5, 2012, which the PCRA court denied as untimely. On March 23, 2016, this Court vacated Appellant's LWOP sentences and remanded for further proceedings consistent with the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) and *Montgomery v. Louisiana*, 577 U.S. 190, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016). *See Commonwealth v. King*, Nos. 3323 EDA 2014, 3333 EDA 2014 (Pa.Super. filed Mar. 23, 2016) (unpublished memorandum).

Appellant's resentencing was stayed pending the outcome of several relevant decisions that were pending in this Court and our Supreme Court. On November 18, 2022, the court conducted a re-sentencing hearing. At the hearing, the Commonwealth summarized the underlying facts of this case as follows:

> On Friday, May 22, 1998, Willa Pope … hosted a Memorial Day party. The celebration lasted into the early morning hours of Saturday, May 23, 1998.
>
> Shortly after 2:00 a.m. that Saturday morning, multiple shots were fired at Apartment K-55 [where the party was ongoing,] causing a stampede of individuals running for their lives. Through investigation, it was determined that

- 2 -

those shots were fired by [Appellant].

Standing outside of Apartment K-55 that morning was 37-year-old Anthony Jackson. While outside [Mr.] Jackson was [Appellant]'s first victim. One of the shots [Appellant] fired struck Mr. Jackson in his head. The bullet entered above Mr. Jackson's right ear[,] traveled through his skull, [and] exit[ed] above Mr. Jackson's left ear. Mr. Jackson was transported to Frankford-Torresdale Hospital where he was pronounced deceased.

After striking Anthony Jackson, [Appellant] continued his assault on the partygoers and approached the front door of Apartment K-55. As [Appellant] approached, 27-year-old Jackie Wilson was exiting the front door of the apartment[.] While Ms. Wilson was still in the front doorway, [Appellant] fired another shot. That bullet entered Ms. Wilson's back, through her right shoulder blade[,] traveled through her chest, tearing her aorta, and exited [on] the left side of her chest. Ms. Wilson collapsed with her body partially blocking the doorway. She was pronounced dead at the scene.

After Ms. Wilson's collapse, [Appellant] continued to fire rounds while standing in the doorway next to Ms. Wilson's body. It was at that time [that] Saphil Taylor, who was 19-years-old at the time, was shot by the stairs. The bullet entered Mr. Taylor's forehead, piercing his brain, and lodged into the bottom of his skull. He was pronounced dead at the scene[.]

After Mr. Taylor was shot, [Appellant] backed out of the apartment and fled. … As he fled, [Appellant] continued to fire rounds at the apartment. One of those rounds penetrated the apartment window and pierced Milika Brinson's brain through the back of her head[.] Ms. Brinson, who was … 22-years-old, was transported to St. Mary Medical Center where she was pronounced dead.

Lahkeisha Monroe was also in the front room of the apartment that morning with [Ms.] Wilson and [Mr.] Taylor. While she was fleeing the apartment, Ms. Monroe was shot in the head and suffered a laceration to her forehead which required stitches and caused scarring. Ms. Monroe survived that gunshot wound.

- 3 -

After the shooting, [Appellant] fled to New Jersey with co-defendants, Craig Jones and Corey McCloud. As part of their investigation, detectives interviewed Patricia Kenny, Latoya McLane, and Shirley Harden.

[Patricia] Kenny knew [Appellant] and told detectives that she had seen [Appellant] earlier in the evening before the shooting. When Ms. Kenny saw [Appellant, he] asked her if she had a gun.

Latoya McLane also spoke to detectives and told [them] that [Appellant] was in possession of a box of bullets the day of the shooting.

…Shirley Harden told detectives that she spoke with [Appellant] after the shooting. …Ms. Harden [stated] that [Appellant] admitted to killing [Mr.] Jackson, [Ms.] Wilson, [Mr.] Taylor and [Ms.] Brinson. Ms. Harden stated that [Appellant] bragged that he would shoot [the investigating detective] if he attempted to arrest [Appellant].

According to Ms. Harden, [Appellant] laughed as he recounted the incident. Specifically, Ms. Harden stated that [Appellant] laughed at a news program regarding the murders, and specifically laughed when the program mentioned [Mr.] Taylor's name.

Ms. Harden also said that [Appellant] laughed after seeing a photo of [Ms.] Brinson in the newspaper and bragged that he was having sex with her. When asked if it bothered him that he did something to her since he was dating her, [Appellant] replied, and I quote, ["N]o, the bitch shouldn't have been there[. S]he was at the wrong place at the wrong time.["]

(N.T. Resentencing Hearing, 11/18/22, at 20-24).

The Commonwealth and Appellant presented witnesses at the hearing.

The sentencing court accurately summarized the testimony as follows:

[Mr.] Jackson's daughter, Tanya Jackson, testified [that Mr.] Jackson was the father of seven children. Ms. Jackson was

the oldest child and twenty years old at the time of her father's death. She had a nervous breakdown, among other mental health issues, as a result of her father's death.

Ms. Jackson also testified that she had participated in a mediation with Appellant in 2010. Appellant explained the crime to her, [as follows.] On the night of the shooting, Appellant had been to two other parties looking for [Mr.] Taylor and [another individual named] Victor Ballard. He and codefendants then went to the party where the shooting occurred. However, when they got to that location, codefendants left Appellant behind, asleep in the car. When Appellant heard a gunshot, he thought someone was shooting at him. He got out of the car, went toward the party, and started randomly shooting. The codefendants were at the back of the house and Appellant was at the front. Codefendants left him there. [Appellant stated that he did not recognize Mr. Jackson but acknowledged that he accidentally] shot [Mr. Jackson when] Appellant was shooting over a bush on the side of the house where [Mr. Jackson] was standing. After [Mr.] Jackson was shot, Appellant went toward the door of the house and shot [Ms.] Brinson[. H]e said he felt sorry for [shooting her]. Appellant said he walked through the door because [Ms. Brinson's] body was in the doorway. Appellant [then] saw [Mr. Taylor] getting ready to run up the steps and shot him. Appellant claimed that [he did not shoot Ms. Wilson and] one of the [co]defendants must have shot [her]. … She testified that "[h]e expressed remorse for killing my father" and "was sorry that he messed up my life." [(N.T. Resentencing Hearing at 97).] She also testified that he expressed remorse for [Ms.] Wilson and [Ms.] Brinson but said, "I don't have remorse for [Mr. Taylor] because it could have been me or him." [(*Id.* at 99).]

[The Commonwealth further presented testimony and victim impact statements from various family members of Ms. Wilson, Mr. Taylor and Mr. Brinson. They all explained the lasting trauma, grief, and mental anguish that have filled their lives as a result of the loss of their loved ones.]

\* \* \*

Appellant presented testimony from four witnesses.

- 5 -

Lieutenant Shawn Homer testified that he was employed in 2014 and/or 2015 at State Correctional Institution (SCI) Smithfield where Appellant was incarcerated. He described Appellant's exceptional performance while he was enrolled in the drug and alcohol treatment program there. Appellant was a leader and one of the best senior coordinators in the program, mentoring others, working after hours, organizing meetings, and continuing with the program even after he himself had completed it. As a block worker Appellant required little to no supervision and cleaned the block from top to bottom. Appellant was respectful and not aggressive toward other staff and inmates. When discussing the serious 2015 prison assault he committed, Appellant told Lt. Homer that another prisoner had first spit in his face.

Appellant told Lt. Homer that the murders occurred during a drug deal. Appellant said he was high and ended up just shooting out from [the] bushes blindly and inadvertently because he heard a noise or someone pulling a gun or shooting a gun or someone talking outside of the bushes. [From hearing Appellant's account of events,] Lt. Homer got the impression that the shooting was an accident and found Appellant to be extremely remorseful. [(***See id.*** at 11-123).]

Rachel Mills testified that she was previously employed as a treatment specialist at SCI Smithfield. She met Appellant while running a group for juvenile lifers in 2013 or 2014. The group was initially a support group, but after the ***Montgomery*** decision, the group began programs to prepare juvenile lifers for potential release. Ms. Mills explained, "[I]nitially, [Appellant] would come to the meetings, but, typically, he would leave because he would have headaches and issues that he was dealing with, I guess. But then at a certain point we had a conversation about that, and after that he started to attend regularly." [(***Id.*** at 137).] Appellant became a positive, active participant, helping other members in the group. Appellant was very respectful with Ms. Mills and she felt safe around him. Appellant was never aggressive toward other inmates or staff.

When describing the murders to Ms. Mills, Appellant said he shot at people at a party indiscriminately and did not realize

- 6 -

the damage he caused until after the fact. She believed Appellant was remorseful for his crimes because he was tearful when telling his story to the violence prevention group in prison. He talked about the mediation and the impact it had on him and the family member of a victim. [(*Id.* at 133-149).]

Consultant Kathleen Gnall, who worked for the Pennsylvania Department of Corrections for seventeen years and was the former chair of the Governor's Reentry Task Force, was received as an expert witness in prison adjustment, readiness for release from incarceration, and reentry planning. Ms. Gnall was asked by defense counsel to analyze: (1) Appellant's static and historical risk factors; (2) his dynamic or changeable risk factors and how Appellant addressed those factors over his twenty-four years of continuous confinement; and (3) the adequacy of his proposed reentry plan.…

Ms. Gnall explained that Appellant's static risk factors, *e.g.* home environment, neighborhood violence, abuse, etc., did not have the same level of risk predictability because Appellant had been removed from those risk factors for twenty-four years. Ms. Gnall opined that the dynamic risk factors (anti-social attitudes; beliefs and values; poor problem-solving and decision-making ability; impulsivity; influence by peers; drug and alcohol abuse; low levels of education; a lack of vocational or work skills; and a lack of work history) that [she's] been presented with have been mitigated within the correctional environment, thereby lowering Appellant's probability of committing an additional offense. She found no rehabilitative value left in Appellant remaining in prison. [(*Id.* at 157-175).]

On cross-examination, Ms. Gnall clarified that she did not opine that Appellant would be a good candidate for release. Ms. Gnall explained that she was unable to offer an opinion on whether Appellant had a low versus moderate risk to reoffend because there are no actuarial risk assessments and/or needs instruments designed for and tested on inmates who have been continuously confined for decades. [(*Id.* at 165-68, 182-83).]

Ms. Gnall reviewed the eighteen misconducts Appellant

received in prison—eight were classified as "the most serious misconducts," seven were deemed less serious, and three were dismissed. [(*Id.* at 170).] She testified that the younger the inmate, between eighteen and twenty-four years old, the more likely he or she is to engage in misconducts. She thought it noteworthy that during the last seven years, Appellant had no misconducts. (*Id.* at 171).

However, Ms. Gnall conceded that Appellant had been committing violent misconducts in prison into his thirties. She agreed that out of Appellant's fifteen misconducts, four were violent and three of those four violent misconducts occurred as late as 2012, 2014, and 2015. After the 2015 prison assault, the victim was hospitalized. She also agreed that if Appellant had committed prison misconducts, he was more likely to commit future crimes.

Ms. Gnall answered that the underlying crime was not factored into her opinion. In addition, she testified that she finds no causal relationship between remorse and recidivism. However, she [further explained:]

[I]f [Appellant] explained the crime and how he felt about the crime in such a way that I'm thinking, listen, this guy really doesn't—he's not accepting responsibility, he's trying to pass it off on somebody else or whatever, those are antisocial risk factors, antisocial values or beliefs. If he's thinking that, those are criminal thinking errors, and that means he still has unmet needs that should've been addressed. If he's still thinking that way, then I need to know that, because those are factors that matter.

[(*Id.* at 217-18).]

In regard to any reentry plan, Ms. Gnall's report mentioned that Appellant's level of family support bodes well for success in the community should he be released.

Dr. Robin … Timme was received as an expert in forensic psychology and developmental psychology. [(*Id.* at 225-67).] Dr. Timme was asked by defense counsel to meet with Appellant to assess the *Miller* factors and their applicability to Appellant's case. Dr. Timme spoke to Appellant twice in

- 8 -

2018 and once in 2022. He found, in summary:

a. Decisional Factors: Appellant was impulsive and had attention-deficit/hyperactivity disorder (ADHD) [which was untreated, exacerbating impulsive behavior. Appellant does not have any other notable mental health issues].

b. Dependency Factors: Appellant's environment and home life [were] not good. Appellant did not have the support system that others [had to buffer against the impact of childhood adversity]. He had numerous adverse childhood experiences ("ACE") that, based on studies, ranked Appellant within the top three percent of the population prone to an elevated risk of illness, suicide, drug use, etc.

c. Offense Context Factor: Appellant was influenced by [the older] codefendants and determined by Dr. Timme to be a "follower."

d. Rehabilitation Factor: As a juvenile, Appellant's brain development made him less culpable than his adult counterparts. Appellant completed [educational and therapeutic] programs in prison. Appellant did not have a clean record in prison, but that is not uncommon.

e. Legal Competency Factor: Appellant had no prior interaction in the adult system. Due to the possibility of the death penalty being imposed and based on conversations with his family at the time of the plea, Appellant now believes he did not make the best legal choices and regrets entering an open plea.

Based on the findings above, Dr. Timme opined that all five *Miller* factors applied to Appellant's case and that they should be considered for resentencing purposes. [Dr. Timme further opined that Appellant] has the capacity to be rehabilitated, but if he were facing a parole board tomorrow, [Dr. Timme] would absolutely recommend a full-blown risk assessment be done.

When explaining the murders, Appellant told Dr. Timme that he started shooting through the bushes [as follows]:

- 9 -

> [I]n my mind somebody is getting ready to start shooting through the bushes. So I start shooting through the bushes. … [O]nce I couldn't shoot anymore, I turned around and I tore through the way I came. … [I] ran back in the direction of the car. … Craig and Corey were pulling away. They asked what happened. I said, somebody was shooting, I don't know. We turned out to the left and went onto 95 to Philly.

> [(***Id.*** at 248-49)].

> Appellant never told Dr. Timme that he intended to shoot at people or intended to kill people. Dr. Timme interpreted Appellant's version of events as indicative of the "bumbling, unsophisticated nature that is part and parcel of the adolescent brain development in ***Miller***." (***Id.*** at 249). Dr. Timme conceded that the rehabilitative factor would be discounted if Appellant was being untruthful with him about the crime.

> Seven of [Appellant]'s family members and friends were present at the resentencing hearing to support Appellant.

> Appellant exercised his right to allocution at [re]sentencing, reading his statement into the record. For one portion, Appellant stated, "On May 23, 1998, I made a decision that was responsible for taking the lives of [the victims]. … I take full responsibility for the hurt and pain I caused everyone…" [(***Id.*** at 271-74).]

(Resentencing Court Opinion, filed 6/7/23, at 8-18) (some citations to the record and quotation marks omitted).

On November 21, 2022, the court resentenced Appellant to 20 years to life in prison for each of his four first-degree murder convictions, to be served consecutively. On December 1, 2022, Appellant timely filed a post sentence motion, which the court denied on January 19, 2023. Appellant timely filed a notice of appeal on February 10, 2023. On February 22, 2023, the court

- 10 -

ordered Appellant to file a concise statement of errors complained of on appeal

per Pa.R.A.P. 1925(b), and Appellant complied on March 14, 2023.

Appellant raises the following issues for our review:

1) Where a sentencing court finds that a juvenile defendant has demonstrated a capacity for change and rehabilitation, does it violate the Eighth Amendment of the United States Constitution's prohibition on cruel and unusual punishment to sentence the juvenile to a *de facto* life sentence?

2) Where the Sentencing Court found that [Appellant] demonstrated a capacity for change and rehabilitation, as applied to [Appellant], does it violate the Eighth Amendment of the United States Constitution's prohibition on cruel and unusual punishment to sentence [Appellant] to a *de facto* life sentence?

3) Where a sentencing court finds that a defendant has demonstrated a capacity for change and rehabilitation, does it violate Article I, Section 13 of the Pennsylvania State Constitution's prohibition on cruel punishments to sentence the juvenile to a *de facto* life sentence?

4) Where the Sentencing Court found that [Appellant] has demonstrated capacity for change and rehabilitation, as applied to [Appellant], does it violate Article I, Section 13 of the Pennsylvania State Constitution's prohibition on cruel punishments to sentence [Appellant] to a *de facto* life sentence?

5) Did the Sentencing Court err and abuse its discretion in imposing four sentences of 20 years to life to be served consecutively, rendering [Appellant] ineligible for parole until he is 97 years old, where the Sentencing Court deviated from sentencing norms and statute by placing an inordinate focus on [Appellant's] crime to the detriment of fully considering his youth, history, and rehabilitative needs, and where the Sentencing Court's conclusion about [Appellant's] alleged inadequate remorse and purported continued criminal thinking was contradicted by the evidence.

(Appellant's Brief at 4-5).

In his first four issues combined, Appellant contends that his new sentence is a *de facto* LWOP sentence because the court imposed an aggregate sentence of 80 years to life incarceration, which ensures that Appellant would not be eligible for parole until he is over 97 years old. Appellant acknowledges that **Commonwealth v. Foust**[2] mandates that individual sentences, and not aggregate sentences, should be considered in determining whether a sentence is a *de facto* life sentence. Nevertheless, Appellant argues that this Court should reconsider **Foust** because it positively cited a case which has since been reversed. Appellant further argues that his sentences should be considered in the aggregate because they were all imposed for murders that occurred in one event in rapid succession.

Additionally, Appellant asserts that the resentencing court found that Appellant has demonstrated a capacity for change and rehabilitation based on the evidence he presented about the circumstances of his childhood and the positive behaviors he has exhibited while incarcerated. Appellant argues that where a court makes a finding that a juvenile offender is capable of change and rehabilitation, the imposition of a *de facto* life sentence is unconstitutional, facially and as applied, under both the Eighth Amendment of the United States

---

[2] **Commonwealth v. Foust**, 180 A.3d 416 (Pa.Super. 2018), *appeal denied*, ___ Pa. ___, 279 A.3d 39 (2022), *abrogated in part by* **Commonwealth v. Felder**, ___ Pa. ___, 269 A.3d 1232 (2022).

Constitution and Article I, Section 13 of the Pennsylvania State Constitution. Appellant concludes that the court imposed an illegal sentence, and this Court should vacate Appellant's judgment of sentence and remand for resentencing. We disagree.

A claim that a court sentenced a juvenile defendant to a *de facto* LWOP sentence implicates the legality of the sentence. *Id.* at 422. "When reviewing the legality of a sentence, our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Melvin*, 172 A.3d 14, 19 (Pa.Super. 2017), *appeal denied*, 646 Pa. 730, 187 A.3d 207 (2018) (citation omitted).

In 2012, the United States Supreme Court held that imposition of a mandatory LWOP sentence for those under 18 years old at the time they committed homicide constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. *See Miller, supra* at 489, 132 S.Ct. at 2475. In *Foust*, this Court determined that *Miller* is also implicated if a juvenile defendant is sentenced to a term-of-years sentence that equates to a *de facto* LWOP sentence. *See Foust, supra* at 441. This Court "decline[d] to draw a bright line … delineating what constitutes a *de facto* LWOP sentence and what constitutes a constitutional term-of-years sentence." *Id.* at 438. Nevertheless, this Court noted that "[t]here are certain term-of-years sentences which clearly constitute *de facto* LWOP sentences. For example, a 150-year sentence is a *de facto* LWOP sentence. Similarly, there are clearly sentences which do not constitute *de facto* LWOP

sentences. A sentence of 30 years to life falls into this category." ***Id.***

The ***Foust*** Court further examined whether a trial court should look to individual sentences or the aggregate sentence when determining whether a sentence amounts to a *de facto* LWOP sentence. ***Id.*** at 434-38. In its analysis, this Court examined Pennsylvania jurisprudence regarding sentencing for multiple convictions and concluded that "Pennsylvania has long disavowed the concept of volume discounts for committing multiple crimes." ***Id.*** at 436. This Court further examined the jurisprudence of other states and acknowledged that courts have arrived at different conclusions regarding the same issue in other states. This Court found persuasive the reasoning in ***McCullough v. State***, 233 Md.App. 702, 168 A.3d 1045 (2017), *reversed by*, ***Carter v. State***, 461 Md. 295, 192 A.3d 695 (2018) as to the following:

> [W]e refuse to place form over substance with respect to *de facto* LWOP sentences. Imposing consecutive term-of-years sentences for multiple offenses, however, is not placing form over substance. To the contrary, such punishments consider the substance of each individual sentence.

***Id.*** at 436-37. Additionally, the ***Foust*** Court specifically noted that it "disagree[s] with the reasoning of those courts that have examined the aggregate sentence instead of the individual sentences. Determining whether the crimes occurred in one course of conduct, or separate courses of conduct is an unworkable standard and is immaterial for Eighth Amendment purposes." ***Id.*** at 437. Ultimately, the ***Foust*** Court concluded:

> We have scrutinized relevant Pennsylvania case law, prior decisions of the Supreme Court of the United States, and

- 14 -

> persuasive authority from other jurisdictions. Although we acknowledge that there is ground for differing views, we believe that we are on sound legal footing and consistent with Pennsylvania law. Accordingly, we hold that we must consider the individual sentences, not the aggregate, to determine if the trial court imposed a term-of-years sentence which constitutes a *de facto* LWOP sentence.

*Id.* at 437-38.

In 2021, the United States Supreme Court clarified that **Miller** "mandated 'only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing' a life-without-parole sentence." **Jones v. Mississippi**, 593 U.S. 98, 101, 141 S.Ct. 1307, 1311, 209 L.Ed.2d 390, ___ (2021). The **Jones** Court further held that "a separate factual finding of permanent incorrigibility is not required before a sentencer imposes a life-without-parole sentence on a murderer under 18." *Id.* at 113, 141 S.Ct. at 1318-19.

Based on **Jones**, our Supreme Court in **Felder, supra** concluded that that pursuant to **Miller**:

> [A] State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient. A life-without-parole sentence for a juvenile murderer is thus constitutional, and hence no viable **Miller** claim exists, so long as the sentence is not mandatory—that is, so long as the sentencer has discretion to consider the mitigating qualities of youth and impose a lesser punishment.

**Felder, supra** at ____, 269 A.3d at 1243 (citation and quotation marks omitted). Regarding *de facto* LWOP sentences, the Court further stated:

> It logically and necessarily follows that if a discretionary sentencing scheme is constitutionally sufficient to permit the

imposition of a life-without-parole sentence on a juvenile homicide offender, so too can a court impose a sentence that is something less than life without parole. This includes a term-of-years sentence that may amount to a *de facto* life sentence. Stated differently, as long as the sentence was the product of a discretionary sentencing system that included consideration of the juvenile's youth, the Eighth Amendment is satisfied.

*Id.* at \_\_\_, 269 A.3d at 1245-46.

Instantly, the court resentenced Appellant to four consecutive sentences of 20 years to life in prison. Appellant's assertion that his sentences, taken in the aggregate, constitute an illegal *de facto* LWOP sentence conflicts with this Court's prior decision in **Foust**. Although Appellant argues that this Court should overturn **Foust**, this panel is bound by existing precedent and, therefore, lacks the authority to overturn another panel decision.[3] **See Commonwealth v. May**, 271 A.3d 475, 482 (Pa.Super. 2022), *appeal denied*, \_\_\_ Pa. \_\_\_, 286 A.3d 214 (2022) (reiterating that three-judge panel of this Court is not empowered to overrule another panel of Superior Court). Accordingly, **Foust** is controlling in this matter, and we look to Appellant's individual sentences to evaluate whether the court sentenced him to a *de facto*

---

[3] Appellant suggests that this Court should overturn **Foust** because it relied on **McCullough** as persuasive authority, and that case was ultimately reversed. Nevertheless, the **Foust** Court clearly acknowledged that courts from other states disagreed with its decision and concluded that its decision was on sound legal footing and consistent with Pennsylvania law. Additionally, the **Foust** Court specifically considered and rejected as unworkable Appellant's suggested framework to evaluate sentences based on whether the crimes occurred in one course of conduct. Thus, we disagree that the **Foust** Court's reliance on **McCullough** invalidates the analysis in **Foust**.

LWOP sentence. **Foust** noted that there are certain sentences which clearly do not constitute *de facto* LWOP sentences, including as an example, a sentence of 30 years to life in prison. As such, Appellant's individual sentences of 20 years to life in prison are clearly not *de facto* LWOP sentences. Therefore, Appellant's first four issues, which are premised on the assertion that the court resentenced Appellant to a *de facto* LWOP sentence, must fail. **See Foust, supra**.

Additionally, even if Appellant's sentence was a *de facto* LWOP sentence, our Supreme Court made clear in **Felder** that the Eighth Amendment is not violated if a sentence is the product of a discretionary sentencing system that included consideration of the juvenile's youth. Here, the resentencing court was operating within a discretionary sentencing system and considered Appellant's youth in its resentencing decision. As such, Appellant's sentence, viewed as individual sentences or in the aggregate, does not violate the Eighth Amendment's prohibition against cruel and unusual punishment.[4] **See Felder, supra**.

_____

[4] In her concurrence, Justice Donohoe noted that the **Felder** decision "does not foreclose further developments in the law as to the legality of juvenile LWOP sentences (or their *de facto* equivalent as alleged here) under the Pennsylvania Constitution nor as to how appellate courts will review the discretionary aspects of such sentences." **Id.** at ___, 269 A.3d at 1247 (Donohue, J., concurring). Nevertheless, as Appellant has not established that his sentence was a *de facto* LWOP sentence, we do not further consider whether the Pennsylvania Constitution provides for additional protections for a *de facto* LWOP sentence than the Eighth Amendment.

In his fifth issue, Appellant argues that in fashioning its sentence, the resentencing court focused too heavily on the original crime, Appellant's misconducts while incarcerated, and Appellant's failure to demonstrate remorse. Appellant asserts that the court failed to consider the unrebutted testimony of Appellant's witnesses who testified that Appellant had participated in educational and therapeutic programs while incarcerated, was respectful to other inmates and staff, and Appellant's record of remaining misconduct-free in the last seven years of incarceration. Appellant submits that this testimony demonstrates a veritable change in Appellant's character. Appellant further claims that the court's conclusion that Appellant failed to accept responsibility for his actions was contrary to the evidence. Appellant contends that he took responsibility and expressed remorse for his actions before the court, and multiple witnesses testified that Appellant has taken responsibility for his actions and expressed remorse in his interactions with them in the past. Appellant complains that the court failed to consider Appellant's rehabilitative needs in imposing consecutive sentences where Appellant would not be eligible for parole until he is over 97 years old. Appellant concludes that the court abused its sentencing discretion when it imposed consecutive sentences for each of Appellant's homicide convictions, and this Court should vacate the judgment of sentence. We disagree.

As presented, Appellant's claim challenges the discretionary aspects of sentencing. *See Commonwealth v. Austin*, 66 A.3d 798, 808 (Pa.Super.

2013), *appeal denied*, 621 Pa. 692, 77 A.3d 1258 (2013) (considering challenge to imposition of consecutive sentences as claim involving discretionary aspects of sentencing); **Commonwealth v. Clarke**, 70 A.3d 1281 (Pa.Super. 2013), *appeal denied*, 624 Pa. 671, 85 A.3d 481 (2014) (stating contention that court focused solely on serious nature of crime without adequately considering protection of public or defendant's rehabilitative needs concerns court's sentencing discretion).

Challenges to the discretionary aspects of sentencing do not entitle an appellant to an appeal as of right. **Commonwealth v. Sierra**, 752 A.2d 910, 912 (Pa.Super. 2000). Prior to reaching the merits of a discretionary sentencing issue:

> [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, **see** Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

**Commonwealth v. Evans**, 901 A.2d 528, 533 (Pa.Super. 2006), *appeal denied*, 589 Pa. 727, 909 A.2d 303 (2006) (internal citations omitted). Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or raised in a timely filed post-sentence motion. **Commonwealth v. Mann**, 820 A.2d 788, 794 (Pa.Super. 2003), *appeal denied*, 574 Pa. 759, 831 A.2d 599 (2003).

When appealing the discretionary aspects of a sentence, an appellant must also invoke the appellate court's jurisdiction by, *inter alia*, including in his brief a separate concise statement demonstrating that there is a substantial question as to the appropriateness of the sentence under the Sentencing Code. *Commonwealth v. Mouzon*, 571 Pa. 419, 425-26, 812 A.2d 617, 621-22 (2002); Pa.R.A.P. 2119(f). "The requirement that an appellant separately set forth the reasons relied upon for allowance of appeal furthers the purpose evident in the Sentencing Code as a whole of limiting any challenges to the trial court's evaluation of the multitude of factors impinging on the sentencing decision to exceptional cases." *Commonwealth v. Phillips*, 946 A.2d 103, 112 (Pa.Super. 2008), *cert*. *denied*, 556 U.S. 1264, 129 S.Ct. 2450, 174 L.Ed.2d 240 (2009) (quoting *Commonwealth v. Williams*, 562 A.2d 1385, 1387 (Pa.Super. 1989) (*en banc*)) (emphasis omitted) (internal quotation marks omitted).

"The determination of what constitutes a substantial question must be evaluated on a case-by-case basis." *Commonwealth v. Anderson*, 830 A.2d 1013, 1018 (Pa.Super. 2003). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Sierra, supra* at 913 (quoting *Commonwealth v. Brown*, 741 A.2d 726, 735 (Pa.Super. 1999) (*en banc*), *appeal denied*, 567 Pa. 755, 790

A.2d 1013 (2001)).

Instantly, Appellant raised his sentencing issue in a timely post-sentence motion, filed a timely notice of appeal, and included in his appellate brief a Rule 2119(f) statement. Further, Appellant's assertions arguably raise a substantial question. *See Commonwealth v. Schroat*, 272 A.3d 523, 527 (Pa.Super 2022) (recognizing substantial question where appellant alleged that sentencing court placed inordinate focus on facts of underlying offense, failed to consider relevant mitigating factors, and failed to consider evidence of rehabilitation while in prison); *Commonwealth v. Caldwell*, 117 A.3d 763 (Pa.Super. 2015), *appeal denied*, 633 Pa. 774, 126 A.3d 1282 (2015) (noting that this Court has held that excessive sentence claim, in conjunction with assertion that court failed to consider mitigating factors, raises substantial question). Thus, we proceed to address the merits of Appellant's issue.

"[S]entencing is vested in the sound discretion of the sentencing court, and we shall not disturb a sentence absent a manifest abuse of discretion." *Schroat, supra* at 527. "In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision." *Id.* at 527-28.

Further:

> Long standing precedent ... recognizes that [the Sentencing Code] affords the sentencing court discretion to impose its

> sentence concurrently or consecutively to other sentences being imposed at the same time or to sentences already imposed. We will not disturb consecutive sentences unless the aggregate sentence is grossly disparate to the defendant's conduct, or viscerally appears as patently unreasonable.

*Commonwealth v. Brown*, 249 A.3d 1206, 1212 (Pa.Super. 2021) (citations and quotation marks omitted). *See also Commonwealth v. Zirkle*, 107 A.3d 127, 134 (Pa.Super. 2014), *appeal denied*, 632 Pa. 671, 117 A.3d 297 (2015) (reiterating that defendant "is not entitled to a 'volume discount' because the various crimes occurred in one continuous spree") (citation and quotation marks omitted).

Pursuant to Section 9721(b), "the court shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. § 9721(b). Additionally, "a court is required to consider the particular circumstances of the offense and the character of the defendant." *Commonwealth v. Griffin*, 804 A.2d 1, 10 (Pa.Super. 2002), *cert. denied*, 545 U.S. 1148, 125 S.Ct. 2984, 162 L.Ed.2d 902 (2005). "In particular, the court should refer to the defendant's prior criminal record, his age, personal characteristics and his potential for rehabilitation." *Id.*

Additionally, when sentencing a juvenile convicted of first-degree murder, the sentencing court should use the factors delineated in 18 Pa.C.S.A.

§ 1102.1(d) as guidance in sentencing. ***See Felder, supra*** at ___, 269 A.3d at 1245 n.15 (stating that for juvenile offenders committing first-degree murder prior to June 24, 2012, factors delineated in Section 1102.1 are to serve as non-binding factors providing guidance for sentencing court). These factors include: the impact of the offense on each victim and the community, the threat to the safety of the public or any individual posed by the defendant, the nature and circumstances of the offense committed by the defendant, and the degree of the defendant's culpability. 18 Pa.C.S.A. § 1102.1(d). Section 1102.1(d) also instructs the court to consider age-related characteristics of the defendant, including age, mental capacity, maturity, the degree of criminal sophistication exhibited by the defendant, the nature and extent of any prior delinquent or criminal history, and probation or institutional reports. ***Id.***

Instantly, the court explained its sentencing rationale as follows:

> Before imposing [the] sentence, I have considered the following: the transcripts from the degree of guilt hearing and sentencing on October 1, 1998, October 26, 1998, October 27, 1998, and October 28, 1998; the presentence investigation…; [Appellant's] mitigation report and attached exhibits; sentencing memorandum, including all attachments, and I would say specifically including, but not limited to expert reports, school records, certifications from state programs, letters of support; the Commonwealth sentencing memorandum, including all attachments, including, but not limited to victim impact statements and misconducts.
>
> \*   \*   \*
>
> I considered the testimony presented on November 18, 2022, and all exhibits introduced. I considered the arguments made in court here today. I have considered the

sentencing guidelines and … also the [Section] 1102 sentencing factors. I considered [Appellant's] allocution in this matter.

\* \* \*

As I begin, I note that [Appellant] stands convicted of four first-degree murder counts in which the court concluded that he was the shooter and, therefore, he shot each of the victims with a specific intent to kill.

Before I address the factors to be considered in sentencing, I will say that in reviewing those factors, I have incorporated the **Miller** factors, as well as the [Section] 1102 factors, in reviewing each of the factors on reconsidering sentencing in Pennsylvania. It does not include the analysis of [Appellant's] legal competency because I don't believe I have sufficient evidence upon which to make the decision about that.

With respect to the rehabilitative needs of [Appellant], I considered his age at the time of the offense and attendant factors. He was 17 years, 4 months and 12 days old. I consider[ed] that he had a tumultuous home life. Both parents had drug and alcohol issues, his father was in and out of his life. His home life lacked stability, and I believe he sought a father figure for support in his life.

Dr. [Timme] opined that he had personality issues and I accept that. He is of average or above-average intelligence. He was and is of average maturity and development. He had untreated ADHD, which affected his function of decision-making. He was placed on probation based on an incident involving a gun and marijuana charge. I don't believe he was convicted of both crimes, but he was placed on probation for those matters.

[T]here [is] evidence that [Appellant] dealt drugs prior to the crime at the time of the murder. [Appellant] dropped out of school, did continue to take courses in advance of the murder, and achieved his degree in prison. [Appellant] experienced violence in the community and suffered sexual assaults.

[Appellant] was involved in drug use and criminal activity from a very young age. [Appellant] was found guilty of 15 misconducts up until 2015, [four] of which involved violence. It is unrebutted, however, that his conduct since then has not resulted in any misconducts and, indeed, has been a positive member of the prison community.

[Appellant] participated in mediation voluntarily. [Appellant] has never admitted to intentionally shooting all four victims and has given inconsistent statements. However, in the mediation, he did admit to the intentional killing of Saphil Taylor, and I consider participation in mediation and him taking greater responsibility for the crime as mitigation.

While I do not believe [Appellant] has accepted full responsibility for the crimes for which he's been convicted, he has demonstrated a capacity for change. [Appellant] has assisted and supported other people in and out of the jail and participated in programs and volunteered. [Appellant] has participated in evidence-based programming calculated to reduce risk. [Appellant] has completed drug and alcohol treatment.

I will say that any consideration of remorse is limited because [Appellant] has not fully admitted to these crimes.

With respect to the gravity of the offense, and [Appellant]'s culpability and circumstances of the crime, [Appellant] shot and killed four persons with a specific intent to kill them. He went to the house where this happened, where there was a party going on, with a gun to settle a grudge.

The impact of these murders continues to impact these families. The impact is devastating and has reverberated through the generations. The victims were 22, 27, 37 and 19 years of age. The community's sense of safety was impacted by these four murders. The murders were committed in front of several eyewitnesses.

In terms of the sophistication of the crime, the crime did involve a conspiracy. There's testimony that [Appellant] approached the house from behind the bushes and [Appellant] fled the scene.

- 25 -

In terms of protection of the public, [Appellant] participated in a violent act as recently as 2015. [Appellant] was involved in criminal activity at an early age, as early as age eight. [Appellant], as I have said, has not accepted full responsibility for his conduct.

(N.T. Resentencing Hearing, 11/22/22, at 63-72).

Contrary to Appellant's assertions, the record makes clear that the court did not discount the mitigating evidence that Appellant presented or ignore Appellant's rehabilitative needs. In recognition of Appellant's progress while incarcerated and the expert testimony presented, the court found that Appellant was capable of rehabilitation. As such, the court did not reimpose a LWOP sentence for any of the murder convictions and instead imposed a lesser sentence of 20 years to life imprisonment.

However, the court ultimately determined that consecutive sentences were warranted because of the nature of the crime, Appellant's history of misconducts, and Appellant's failure to fully accept responsibility for his actions. The record supports the court's findings. Appellant intentionally shot and killed four individuals. The families of the victims testified to the lasting impact that Appellant's actions had on their families and the community. Regarding Appellant's prison misconducts, although Appellant did not have any misconducts in recent years, several of Appellant's prior misconducts had been violent, and Appellant had a violent misconduct as recently as 2015.

Additionally, the court's finding that Appellant failed to fully take responsibility for intentionally shooting and killing the victims is also supported

by the record. The court acknowledged that Appellant expressed remorse during his allocution and that several witnesses testified that Appellant acknowledged that he killed the victims and was remorseful for his actions. Nevertheless, the court noted that Appellant has given various accounts of the murders to various witnesses that fail to fully take responsibility for the intentional nature of his actions. Appellant told Ms. Jackson that he accidentally shot her father. Appellant told Lieutenant Homer that he was high and shot out of the bushes blindly and inadvertently. Appellant told Ms. Mills that he shot at people at a party indiscriminately. Appellant told Dr. Timme that he shot people through the bushes because he thought someone was about to shoot at him.

Based on our review of the record, we cannot say that the court abused its sentencing discretion.[5] **See Schroat, supra**. **See also Foust, supra** at 441 (stating "This Court has never held that running sentences for first-degree murder consecutively was an abuse of discretion"). Therefore, Appellant's final issue merits no relief. Accordingly, we affirm.

Judgment of sentence affirmed.

_____

[5] Appellant argues that the court abused its sentencing discretion because it resentenced another juvenile offender who committed two first-degree murders to two concurrent sentences of 45 years to life imprisonment. Appellant's assertion is in direct conflict with the sentencing court's mandate to consider the particular circumstances of the offense and the character of the defendant in each case. **See Griffin, supra**.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>10/11/2024</u>